IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
ALBANY DIVISION

| | | |
|---|---|---|
| ASHLEY JOHNSON and JILL UPDIKE, | : | |
| | : | |
| Plaintiffs, | : | |
| | : | |
| v. | : | CASE NO.: 1:22-CV-51 (LAG) |
| | : | |
| PHOEBE PUTNEY HEALTH SYSTEM INC., | : | |
| | : | |
| | : | |
| Defendant. | : | |
| | : | |

## ORDER

Before the Court is Defendant's Motion for Summary Judgment as to Plaintiff Jill Updike (Doc. 14). For the reasons below, Defendant's Motion is **GRANTED**.

## PROCEDURAL BACKGROUND

On April 26, 2022, Plaintiffs Ashley Johnson and Jill Updike filed this action against Defendant Phoebe Putney Health System Inc., their former employer. (Doc. 1). Plaintiff Updike alleges "unlawful employment practices by Defendant[,]" including violations of the Americans with Disability Act of 1990 (ADA), 42 U.S.C. § 12101 *et seq.* and the Family Medical Leave Act (FMLA), 29 U.S.C. § 2601 *et seq.* (*Id.* ¶ 1). Specifically, Plaintiff Updike alleges that she was "subjected to retaliation for engaging in protected activities under the ADA and the FMLA." (*Id.*). As remedy, Plaintiff Updike seeks back pay, front pay, lost benefits, noneconomic compensatory damages, punitive damages under the ADA, attorneys' fees, costs of litigation, and "injunctive and declaratory relief as appropriate." (*Id.*). On May 1, 2023, Defendant filed the subject Motion for Summary Judgment as to Plaintiff Updike's claims. (Doc. 14). The Parties timely filed their respective Responses and Replies, and the Motion is now ripe for review. (Docs. 17, 20); *see* M.D. Ga. L. R. 7.3.1(A).

## LEGAL STANDARD

Under Federal Rule of Civil Procedure 56(a), summary judgment is appropriate where "the evidence shows 'that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *Gogel v. Kia Motors Mfg. of Ga., Inc.*, 967 F.3d 1121, 1134 (11th Cir. 2020) (en banc) (quoting Fed. R. Civ. P. 56(a)). "A genuine issue of material fact does not exist unless there is sufficient evidence favoring the nonmoving party for a reasonable jury to return a verdict in its favor." *Chapman v. AI Transp.*, 229 F.3d 1012, 1023 (11th Cir. 2000) (en banc) (quoting *Haves v. City of Miami*, 52 F.3d 918, 921 (11th Cir. 1995)). "An issue of fact is 'material' if it is a legal element of the claim under the applicable substantive law which might affect the outcome of the case." *Allen v. Tyson Foods, Inc.*, 121 F.3d 642, 646 (11th Cir. 1997) (citations omitted). "An issue of fact is 'genuine' if the record taken as a whole could lead a rational trier of fact to find for the nonmoving party." *Felts v. Wells Fargo Bank, N.A.*, 893 F.3d 1305, 1311 (11th Cir. 2018) (quoting *Hickson Corp. v. N. Crossarm Co.*, 357 F.3d 1256, 1259–60 (11th Cir. 2004)). At summary judgment, the Court views the evidence "in the light most favorable to the non-moving party" and resolves factual disputes for the nonmoving party when doing so is supported by sufficient evidence. *Gogel*, 967 F.3d at 1134 (quoting *Thomas v. Cooper Lighting, Inc.*, 506 F.3d 1361, 1363 (11th Cir. 2007)); *Whitehead v. BBVA Compass Bank*, 979 F.3d 1327, 1328 (11th Cir. 2020).

The movant bears the initial burden of showing, by reference to the record, that there is no genuine issue of material fact. *See Shaw v. City of Selma*, 884 F.3d 1093, 1098 (11th Cir. 2018); *Whitehead*, 979 F.3d at 1328. The movant can meet this burden by presenting evidence showing that there is no genuine dispute of material fact or by demonstrating that the nonmoving party has failed to present evidence in support of some element of its case on which it bears the ultimate burden of proof. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322–24 (1986); *McGee v. Sentinel Offender Servs., LLC*, 719 F.3d 1236, 1242 (11th Cir. 2013) (per curiam). If the movant meets their initial burden, the nonmoving party must demonstrate that there is a genuine dispute for trial. *Whitehead*, 979 F.3d at 1328 (citing *Celotex Corp.*, 447 U.S. at 324). The nonmovant must "go beyond the pleadings and []

present competent evidence in the form of affidavits, answers to interrogatories, depositions, admissions and the like, designating specific facts showing a genuine issue for trial." *Lamar v. Wells Fargo Bank*, 597 F. App'x 555, 557 (11th Cir. 2014) (per curiam) (citing *Celotex Corp.*, 477 U.S. at 324). "All material facts contained in the movant's statement which are not specifically controverted by specific citation to particular parts of materials in the record shall be deemed to have been admitted, unless otherwise inappropriate." M.D. Ga. L.R. 56; *see Mason v. George*, 24 F. Supp. 3d 1254, 1260 (M.D. Ga. 2014).

## FACTUAL BACKGROUND[1]

On August 8, 2020, Plaintiff Jill Updike started work at Defendant Phoebe Putney Health System, Inc. as the Corporate Director of Compensation & Benefits. (Doc. 14-2 ¶ 3; Doc. 17-2 ¶ 1). In her role, Plaintiff Updike "oversaw the benefits and leave administration process for [Defendant's] employees as well as the compensation department" and became Plaintiff Ashley Johnson's "direct supervisor." (Doc. 14-2 ¶ 3; Doc. 17-2 ¶ 2). Plaintiff Updike "relied heavily" on Plaintiff Johnson to "make sure that the [compensation] department was running as smoothly as it could[.]" (Doc. 14-2 ¶ 4; Doc. 14-7 at 55:16–22). In early 2021, Plaintiff Johnson told Plaintiff Updike that she was "struggling with issues related to depression and anxiety" and that the medication she was prescribed to address these issues caused drowsiness. (Doc. 14-2 ¶¶ 4, 11–12, 14; Doc. 16-

---

[1]    The Court derives the relevant facts from the Defendant's Statement of Material Facts (Doc. 14-2), Plaintiff's respective response (Doc. 17-2), and the record. Defendant simultaneously filed Motions for Summary Judgment against both Plaintiff's in this matter. (Docs. 14, 15; *see* Docket). Defendant filed one Statement of Material Facts in support of both Motions. (*See* Doc. 14-2; Doc. 15-1 at 1 n.1). Local Rule 56 requires that "[t]he respondent to a motion for summary judgment . . . attach to the response a separate and concise statement of material facts, numbered separately to which the respondent contends there exists a genuine dispute to be tried. Response shall be made to each of the movant's numbered material facts. All material facts contained in the movant's statement which are not specifically controverted by specific citation to particular parts of materials in the record shall be deemed to have been admitted, unless otherwise inappropriate." M.D. Ga. L.R. 56 (emphasis omitted). Plaintiffs Updike and Johnson each filed separate Statements of Material Facts in their Reponses to the respective Motions, but neither Statement of Material Facts is responsive to the Statement of Material Facts submitted by Defendant as each Plaintiff failed to controvert the facts asserted in Defendant's Statement of Material Facts by specific citation to the record. (*See* Docs. 14-2, 16-2, 17-2). Accordingly, the facts set forth in Defendant's Statement of Material Facts (Doc. 14-2) are deemed admitted where appropriate.

2 ¶¶ 10–11; Doc. 17-2 ¶ 3). As a result, Plaintiff Updike permitted Plaintiff Johnson to work "a flex-time schedule" and to work remotely. (Doc. 14-2 ¶¶ 5, 12, 20; Doc. 16-2 ¶ 12; Doc. 17-2 ¶ 4). The typical workday hours for Plaintiff Updike's department were 8:00 a.m. to 5:00 p.m. (Doc. 14-2 ¶ 8; Doc. 14-12 at 19:23–25). While working on the flex-time schedule, Plaintiff Updike and Plaintiff Johnson did not have any written or verbal communication about Plaintiff Johnson's work hours. (Doc. 14-2 ¶ 20; Doc. 14-7 at 42:22–43:9). Plaintiff Updike did not monitor Plaintiff Johnson's work hours, nor did she require Plaintiff Johnson to comply with Defendant's policy or department practice with regard to time-keeping. (Doc. 14-2 ¶ 10). Instead, Plaintiff Updike reminded Plaintiff "Johnson at the end of each pay period that [Plaintiff] Johnson needed to put in time for the entire period." (*Id.* ¶¶ 10, 21, 24; *see* Doc. 14-13). As her immediate supervisor, Plaintiff Updike "had to approve all of [Plaintiff] Johnson's time entries." (Doc. 14-2 ¶ 24). When Plaintiff Updike texted Plaintiff Johnson "at the end of a pay period and just prior to her submission of time to the payroll department[,]" Plaintiff Updike "approve[d] whatever was entered by [Plaintiff] Johnson . . . without question and without any verification as to whether work had been performed or the amount of work being performed." (*Id.*).

Defendant requires exempt employees to "clock in on each day they work[]." (Doc. 14-2 ¶¶ 10, 21; Doc. 16-2 ¶ 20). Every new employee employed by Defendant participates in an orientation where they are informed about Defendant's policies and procedures. (Doc. 14-2 ¶¶ 17–18; Doc. 14-1 at 38:18–39:6). Per Defendant's policy, exempt employees are paid for the entire day when they badge in, even "if someone works for half-an-hour and does nothing else the rest of the day." (Doc. 14-10 at 31:6–32:13; Doc. 14-2 ¶ 21). Employees who "manipulat[e] a system and tak[e] advantage of it to basically clock in and then take the rest of the day off" are subject to discipline. (Doc. 14-10 at 3:17–33:6; Doc. 14-2 ¶ 21). Failing to clock in "is a terminable offense." (Doc. 14-2 ¶ 23; Doc. 14-11 at 73:13–18). Although reviewing Defendant's policies and procedures with her subordinates was a part of Plaintiff Updike's responsibilities, she did not instruct her subordinates, including Plaintiff Johnson to review the Defendant's policies listed on Defendant's intranet. (Doc. 14-2 ¶ 18; Doc. 14-7 at 28:22–29:3, 51:17–22). Although the Defendant's

4

policy required employees to "badge in once per day[,]" the compensation department practice was to badge in "at a minimum biweekly." (Doc. 14-2 ¶ 10; Doc. 14-7 at 94:9–16; Doc. 17-2 ¶ 7). Defendant has no specific policy on flex time and department managers are permitted to allow a flex-time schedule at their discretion. (Doc. 14-2 ¶ 15; Doc. 14-11 at 68:6–11; Doc. 14-10 at 36:22–24). The Parties dispute whether the flex-time accommodation was communicated to and approved by the Corporate Human Resources Department or the Vice President of Human Resources. (Doc. 14-2 ¶¶ 5–6, 15; Doc. 16-2 ¶¶ 13, 17; Doc. 17-2 ¶ 5).

Tony Welch (Welch), the Chief HR Officer, had "ultimate authority to approve or deny an ADA-based accommodation at Phoebe," and Plaintiff Updike reported to Welch. (Doc. 14-2 ¶ 16; Doc. 14-11 at 28:21–24, 84:15–16; Doc. 17-2 ¶ 2). Welch testified that sometime in the fall of 2021, while on a call with Plaintiff Updike and Melinda Wilson (Wilson), who became Plaintiff Johnson's direct supervisor in August of 2021, Plaintiff Updike told Welch that Plaintiff Johnson "had missed about a month" of work, at which point Welch asked "specifically how much FMLA time [Plaintiff Johnson] ha[d] left[.]" (Doc. 14-10 at 28:19–29:19, 35:6–15). Plaintiff Updike "responded that she had not put [Plaintiff Johnson] on FMLA [leave]." (*Id.* at 28:18–29:6). Welch further testified that Plaintiff Updike never informed him "that the issues were serious enough to . . . warrant FMLA leave" and it was Plaintiff Updike's responsibility to request FMLA leave on Plaintiff Johnson's behalf. (*Id.* at 96:24–97:15).

Plaintiff Johnson's supervision changed on August 9, 2021, when Defendant hired Wilson as a Total Rewards Manager, and Wilson became Plaintiff Johnson's direct supervisor. (Doc. 14-2 ¶ 27). Plaintiff Updike "maintained control of approving [Plaintiff] Johnson's time card for a while after []Wilson started" even though Wilson "was actually managing the day to day." (Doc. 14-2 ¶ 27; Doc. 14-7 at 78:11–22). "During the first two months following []Wilson's hire, there were many times that []Wilson could not get in touch with [Plaintiff] Johnson at all during the core business hours, even though [Plaintiff] Johnson was supposed to have been working." (Doc. 14-2 ¶ 29; Doc. 14-12 at 20:7–24:3). When Wilson questioned Plaintiff Updike about Plaintiff Johnson's availability throughout

the workday and the impact on customer service, Plaintiff Updike told Wilson that Plaintiff Johnson "had some health conditions" and that she had been permitted "to be flexible in her scheduling[.]" (Doc. 14-2 ¶ 30; Doc. 14-7 at 36:5–20).

On October 22, 2021, Plaintiff Updike completed an Annual Staff Evaluation of Plaintiff Johnson. (Doc. 14-2 ¶ 32; *see* Doc. 14-16). Plaintiff Updike gave Plaintiff Johnson a "[n]eeds development" in "decision making" and commented that "[i]mprovement is needed in the area of asking for help when needed and communicating when she is not able to complete tasks . . . . Priority setting has been difficult for [Plaintiff Johnson] which resulted in her being overwhelmed much of the time." (Doc. 14-2 ¶ 32(a); Doc. 14-16 at 3). Plaintiff Updike also gave Plaintiff Johnson a "[n]eeds [d]evelopment" in "accountability & performance improvement" and commented that Plaintiff Johnson,

> has become overwhelmed by the sheer volume of work this year and her performance has suffered because of this. It is important for [Plaintiff Johnson] to take one thing at a time and deliver quality work in a timely manner. If she is unable to meet deadlines it is important th[at] [Plaintiff Johnson] communicate with the customer. I would also like for her to work on negotiating and communicating reasonable customer expectations and then follow through accordingly.

(Doc. 14-2 ¶ 32(b); Doc. 14-16 at 3).

Plaintiff Updike gave Plaintiff Johnson a "[n]eeds [d]evelopment" in the area of "teamwork & communication" and commented: "[w]hen [Plaintiff Johnson] is present[,] her teamwork and communication skills are an asset. However, her frequent unplanned absences have made it difficult for the rest of the team and the organization to find a good working cadence and gain momentum on projects." (Doc. 14-2 ¶ 32(c); Doc. 14-16 at 4). Plaintiff Updike also commented that "[i]t is important that [Plaintiff Johnson] follow clock in procedures going forward[.] [Plaintiff Johnson] must use Quick Badge to record attendance in the API Time Keeping system." (Doc. 14-2 ¶ 32(d)(1); Doc. 14-16 at 5). Further, Plaintiff Updike commented that although Plaintiff Johnson "has great professional potential[,]" the team "need[ed] [her] to be fully present with [them] and to contribute to her potential." (Doc. 14-2 ¶ (d)(2); Doc. 14-16 at 5). At the end of the

evaluation, Plaintiff Johnson commented that she "agree[d] with the assessments made by [Plaintiff Updike and was] looking forward to a fresh start[.]" (Doc. 14-2 ¶ 33; Doc. 14-16 at 5).

On October 22, 2021, Plaintiff Johnson and Wilson met via telephone for a one-on-one conversation about Plaintiff Johnson's leave and expectations upon her return. (Doc. 14-12 at 46:13–21; Doc. 14-6 at 107:25–108:20). About ten minutes after the call, there was a team "handoff" meeting to discuss the distribution of Plaintiff's Johnson's responsibilities during her leave. (Doc. 14-12 at 46:13–21; Doc. 14-6 at 108:20–109:12). During the team handoff meeting, while discussing circumstances in which someone "needed to take a leave of absence" and could "not continue to do the work[,]" Plaintiff Johnson claims that Wilson said that "their status would be . . . essentially demoted." (Doc. 14-6 at 110:8–16). Wilson denies saying this. (Doc. 14-12 at 52:23–53:11). "Almost immediately after" the team handoff meeting, Plaintiff Johnson filed a complaint with Welch about Wilson's comments. (Doc. 14-6 at 111:9–12, 111:23–112:2; Doc. 16-2 ¶ 29).

On October 25, 2021, Cassandra Haynes (Haynes), the Corporate Director of Human Resources, informed Wilson that Plaintiff Johnson had "submitted a concern to compliance about a conversation during [the] handoff meeting[.]" (Doc. 14-2 ¶¶ 36, 40; Doc. 14-12 at 46:22–47:1; *see* Doc. 16-5).[2] That same day, Wilson e-mailed Haynes, detailing her "concerns about [Plaintiff] Johnson's performance" and informed Haynes that she had suggested to Plaintiff Johnson "that [she] apply for FMLA leave[.]" (Doc. 14-2 ¶ 36; *see* Doc. 14-17). On October 26, 2021, Plaintiff Johnson "complained to []Haynes that she believed []Wilson may have made a veiled threat about her taking FMLA leave." (Doc. 14-2 ¶ 40; *see* Doc. 14-18). Plaintiff Johnson e-mailed Haynes, stating that during the handoff meeting, while discussing "circumstances in which full-time employees might [be] reclassified as part time," Wilson said,

> a perfect example of this scenario would be if the team had a
> Comp Analyst that was not performing well and couldn't
> handle the workload they were given so they decide to go [part-

---

[2]     While it is not clear from the record, the Court presumes that Welch advised Haynes of Plaintiff's complaint.

time]. When they want to come back full time[,] they can't handle the stress of the work so we will demote them and hire them on full time[.]

(Doc. 14-2 ¶ 40; Doc. 16-2 ¶ 28; Doc. 16-5). Haynes let Plaintiff Johnson know that she would look into it. (Doc. 14-6 at 118:24–119:5). Haynes conducted an investigation of the incident and determined that Wilson had not targeted Plaintiff Johnson. (Doc. 14-2 ¶ 41; Doc. 14-11 at 119:11–22).

On November 4, 2021, Haynes submitted an anonymous "good faith allegation" to Defendant's Compliance and Ethics Department "report[ing] a number of concerns about a number of people and issues[,]" including her belief that "earlier [in 2021] [Plaintiff] Updike allowed [Plaintiff] Johnson to take off three to four weeks but continued to pay her without making her use any accrued paid time off." (Doc. 14-2 ¶ 42; Doc. 14-11 at 143:2–24, 144:14–24; *see* Doc. 14-22). The Compliance and Ethics Department conducted an investigation during which they reviewed several documents and resources and interviewed several employees. (*See* Doc. 14-22). The investigation "was conducted primarily by Janine Sarti, in-house legal counsel for [Defendant], and Jonathan McGuire, then-Corporate Director and Compliance and Privacy Officer, with some oversight from Josh Miller, then-Chief Compliance Officer." (Doc. 14-2 ¶ 57).

On November 18, 2021, while the investigation was ongoing, Plaintiff Updike told Welch that she wanted to resign. (Doc. 14-2 ¶ 51; Doc. 14-10 at 114:11–24; Doc. 14-22; *see also* Doc. 14-2 ¶ 57). Plaintiff Updike did not provide a specific date for her resignation, but "left it up to [Welch] that [he] needed to find somebody because she was done." (Doc. 14-2 ¶ 51; Doc. 14-10 at 115:13–20; *see* Doc. 14-7 at 81:9–82:1). On November 30, 2021, the Compliance and Ethics Department issued a report of the investigation and recommended that Plaintiff Updike "receive a Level 3, Final Written Warning for not validating [Plaintiff] Johnson's time and attendance records resulting in repeated failures to follow the established time and attendance badging process, failure to properly oversee the performance of a remote employee and her acceptance of [Plaintiff Johnson's] time off

8

due to job related stress without seeking approval from [Welch]." (Doc. 14-22 at 2; Doc. 14-2 ¶ 57).

At some point, Plaintiff Updike submitted a resignation letter dated November 22, 2021, effective December 31, 2021. In the letter, Plaintiff Updike stated,

> As we have discussed several times over the past year, despite my efforts to make incremental improvements for Phoebe, it has been a challenge which has depleted my inner resources. I find that for my personal health and well being I can no longer continue employment. I feel confident that I have made the decisions that enabled Phoebe to get through the darkest of hours.

(Doc. 14-2 ¶ 52). There is some dispute as to exactly when Plaintiff Updike submitted the letter. Plaintiff Updike claims that she "submitted her resignation letter at some point within a week of December 15[, 2021]." (Doc. 17-2 ¶¶ 25–26; *see* Doc. 14-7 at 83:24–84:11). Defendant claims that Plaintiff Updike submitted the letter on November 22, 2021 and argues that Plaintiff Updike's claim that she misdated the letter is "preposterous" as it makes sense that she would submit such a letter "four days after she told Welch she was resigning[.]" (Doc. 14-1 at 6, 12). Plaintiff Updike also attached a copy of the letter, bearing the November 22, 2021 date, to a December 16, 2021 email to Welch. (Doc. 14-1 at 12).

Plaintiff Updike also claims that she and Welch had a conversation during which Welch gave her the ultimatum to resign or be fired. (Doc. 14-7 at 134:7–9, 136:5–9; *see* Doc. 14-10 at 139:25–136:6). Welch denies this and contends that compliance "wanted [him] to . . . give [Plaintiff Updike] a final written warning on her way out the door." (Doc. 14-10 at 132:25–133:11). Later, when Plaintiff Updike told Miller that Welch gave her an ultimatum of resigning or being fired for gross misconduct, Miller told Plaintiff Updike, "I thought you did resign." (Doc. 14-7 at 102:4–15). Plaintiff Updike stated that she hadn't. (*Id.*). On December 23, 2021, Plaintiff Updike e-mailed Sarti, Miller, and Welch, and requested "a written statement indicating that [she] ha[d] been offered resignation in lieu of termination and an explanation of the findings of th[e] investigation" and "that the required GA [Department of Labor] Separation Notice be completed in such a way that makes [her] eligible for employment benefits." (Doc. 14-24 at 2; Doc. 14-2 ¶¶ 62–63). On

9

February 22, 2022, Plaintiff Updike submitted a Charge of Discrimination to the EEOC for retaliation and disability discrimination. (Doc. 1-2).

## DISCUSSION

Plaintiff Updike asserts claims for retaliation in violation of the Americans with Disabilities Act of 1990 (ADA), as amended, 42 U.S.C.A. § 12101 *et seq.* and retaliation in violation of Family Medical Leave Act (FMLA), 29 U.S.C.A. § 2601 *et seq*. (Doc. 1 ¶¶ 76–85). Defendant argues that it "is entitled to judgment as a matter of law as to both claims" because Plaintiff Updike: (1) "cannot show she was subjected to an adverse employment action, because she voluntarily resigned her employment"; (2) "did not engage in any protected activity"; (3) "violated [Defendant's] policies and instructed her subordinates to do so, and was noncompliant with respect to not offering Plaintiff Ashley Johnson . . . FMLA leave"; and (4) aided and abetted Plaintiff Johnson "in the commission of time theft and more than 150 violations of [Defendant's] policies in a ten-month period." (Doc. 14-1 at 1).

## I.    Retaliation in Violation of the ADA and the FMLA

The ADA prohibits employers from discriminating against a qualified individual on the basis of disability. *Todd v. Fayette Cnty. Sch. Dist.*, 998 F.3d 1203, 1214 (11th Cir. 2021) (citing 42 U.S.C. § 12112(a)). The ADA "also includes 'an express antiretaliation provision[,]' . . . [which] prohibits 'discriminat[ing] against any individual because such individual has opposed any act or practice made unlawful [by the Act] or . . . made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this chapter.'" *Batson v. Salvation Army*, 897 F.3d 1320, 1328 (11th Cir. 2018) (first quoting *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 357 (2013); and then quoting 42 U.S.C. § 12203(a)) (second omission in original)).

The FMLA "provides eligible employees the right to 12 weeks of leave for a serious health condition that makes the employee unable to perform the functions of her position." *Munoz v. Selig Enters., Inc.*, 981 F.3d 1265, 1274 (11th Cir. 2020) (citing *Batson*, 897 F.3d at 1328); *see* 29 U.S.C. § 2612(a)(1)(D)). Further, the FMLA prohibits discrimination

"against any individual for opposing any practice made unlawful" by the Act and further prohibits discrimination

> against any individual because such individual—(1) has filed any charge, or has instituted or caused to be instituted any proceeding, under or related to this subchapter; (2) has given, or is about to give, any information in connection with any inquiry or proceeding relating to any right provided under this subchapter; or (3) has testified, or is about to testify, in any inquiry or proceeding relating to any right provided under this subchapter.

29 U.S.C. § 2615 (a)(2), (b). The FMLA "prohibits employers from retaliating against employees for engaging in protected activities." *Munoz*, 981 F.3d at 1275 (citing *Batson*, 897 F.3d at 1328); *see also Strickland v. Water Works & Sewer Bd. Of City of Birmingham*, 239 F.3d 1199, 1206 (11th Cir. 2001). In order to prove retaliation under the FMLA, "an employee must show that h[er] employer *intentionally* discriminated against h[er] for exercising an FMLA right." *Martin v. Brevard Cnty. Public Schs.*, 543 F.3d 1261, 1267 (11th Cir. 2008) (per curiam) (first citing 29 U.S.C. § 2615(a)(2); and then citing 29 C.F.R. § 825.220(c)).

In order to establish a *prima facie* case of retaliation under either act, "a plaintiff must show that: (1) she engaged in a statutorily protected expression; (2) she suffered an adverse employment action; and (3) there was a causal link between the adverse action and her protected expression." *Parker v. Econ. Opportunity for Savannah-Chatham Cnty. Area, Inc.*, 587 F. App'x 631, 633 (11th Cir. 2014) (per curiam) (citing *Stewart v. Happy Herman's Cheshire Bridge*, 117 F.3d 1278, 1287 (11th Cir. 1997); *Batson*, 897 F.3d at 1328–29. "The third element requires a showing of but-for causation." *Frazier-White v. Gee*, 818 F.3d 1249, 1258 (11th Cir. 2016) (citing *Nassar*, 570 U.S. 338). Once a plaintiff satisfies this burden, "the burden shifts to the employer to articulate a nondiscriminatory reason for the adverse action. If the employer does so, the burden shifts back to the employee to produce evidence that the employer's reason is pretextual." *Munoz*, 981 F.3d at 1275 (citing *Batson*, 897 F.3d at 1328–29).

**A. ADA Retaliation Claim**

In the Complaint, Plaintiff Updike makes the conclusory allegation that she "engaged in protected activity by opposing an act or practice made unlawful under the ADA, i.e., Defendant's retaliatory conduct regarding Plaintiff Johnson; and by facilitating Plaintiff's lawful accommodation under the ADA." (Doc. 1 ¶ 77). It is unclear from the Complaint or Plaintiff Updike's Response to the Motion for Summary Judgment (Doc. 14) what specific actions Plaintiff Updike believes constitute her engagement in ADA protected activities, but the Court considers two possibilities. First, Plaintiff Updike appears to assert that she engaged in ADA protected activity when she opposed "Defendant's retaliatory conduct regarding Plaintiff Johnson" by "defen[ding] [Plaintiff] Johnson's attendance history during the compliance investigation[.]" (Doc. 1 ¶ 77; Doc. 17-1 at 8). Second, while Plaintiff Updike does not elaborate on her assertion that she "facilitate[ed] Plaintiff's lawful accommodation under the ADA[,]" the Court assumes that she is referring to allowing Plaintiff Johnson to work a flex-schedule. (Doc. 1 ¶ 77).

With regard to her defense of Plaintiff Johnson's attendance history, Plaintiff Updike never communicated ***to Defendant*** that she was opposing an unlawful employment practice by Defendant. An employee engages in protected expression when she opposes a practice the ADA makes unlawful or when she makes a request for a reasonable accommodation. 42 U.S.C. § 12203(a); *Frazier-White*, 818 F.3d at 1258 (citing *Standard v. A.B.E.L. Servs., Inc.*, 161 F.3d 1318, 1328 (11th Cir. 1998), *abrogated on other grounds by Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53 (2006)). Both informal complaints and internal grievances can be statutorily protected activity. *See Rollins v. Fla. Dep't of L. Enf't*, 868 F.2d 397, 400 (11th Cir. 1989) (per curiam). But, "[a] complaint about an employment practice constitutes protected opposition only if the individual explicitly or implicitly communicates a belief that the [employment] practice constitutes unlawful employment discrimination." *Murphy v. City of Aventura*, 383 F. App'x 915, 918 (11th Cir. 2010) (per curiam) (internal quotation marks and citation omitted). "At a minimum, a plaintiff must generally establish that the employer was actually aware of the protected [activity] at the time [the employer] took adverse employment action." *Goldsmith*

12

*v. City of Atmore*, 996 F.2d 1155, 1163 (11th Cir. 1993) (citation omitted). To the extent that Plaintiff Updike argued against Plaintiff Johnson's termination for stealing time, she never implicitly or explicitly communicated a belief that Defendant unlawfully investigated or terminated Plaintiff Johnson for seeking an accommodation for a disability. Rather, Plaintiff Updike's defense of Plaintiff Johnson came in the form of telling Welch that she "didn't agree with the outcome of the investigation[,]" expressing the same during her compliance interview, and offering to provide records "that would show that there was no mismanagement." (Doc. 14-7 at 89:4–11, 90:14–91:5). These actions do not constitute engaging in a protected activity.

Plaintiff Updike arguably engaged in a protected activity by accommodating Plaintiff Johnson's disability—allowing her to work a flex-schedule. Moreover, Plaintiff Updike testified that she made Welch aware of the accommodation. (Doc. 14-7 at 38:5–20; 42:18–22, 44:20–24). Accordingly, there is evidence in the record that Defendant "was actually aware of the protected [activity] at the time" of Plaintiff's resignation. *See Goldsmith*, 996 F.2d at 1163. Thus, the Court considers whether Plaintiff Updike experienced an adverse employment action and whether there is a causal connection between the two. Defendant argues that Plaintiff Updike cannot satisfy the adverse employment action requirement because her "resignation was voluntary and cannot suffice to constitute an adverse employment action for purposes of her retaliation claims." (Doc. 14-1 at 10). Plaintiff Updike argues that she "easily satisfies the adverse action prong of her retaliation claims" because her resignation was the result of a "resign-or-be fired ultimatum[.]" (Doc. 17-1 at 6–7).

"An adverse employment action is an action that 'might have dissuaded a reasonable worker' from engaging in protected activity." *Chandler v. Sheriff, Walton Cnty.*, No. 22-13698, 2023 WL 7297918, at *2 (11th Cir. 2023) (per curiam) (quoting *Burlington N. & Santa Fe Ry. Co*, 548 U.S. at 68). Adverse employment actions include "conduct that alters the employee's compensation, terms, conditions, or privileges of employment, deprives him or her of employment opportunities, or adversely affects his or her status as an employee." *Id.* (quoting *Cotton v. Cracker Barrel Old Country Store, Inc.*, 434 F.3d 1227,

1233 (11th Cir. 2006) (internal quotation marks omitted)). "An employee's *voluntary* resignation[,]" however, "is not an adverse employment action." *Andrews v. Koch Foods of Pine Mountain Valley, LLC*, No. 4:18-CV-16 (CDL), 2019 WL 13301152, at *4 (M.D. Ga. May 10, 2019) (citing *Rodriguez v. City of Doral*, 863 F.3d 1343, 1352 (11th Cir. 2017)). "But, if an employee presents sufficient evidence from which a reasonable jury could conclude that her resignation was so involuntary that it amounted to a constructive discharge, the employee can avoid summary judgment." *Id.* Resignations "forced by the employer's coercion or duress" are not considered voluntary. *Id.*

The question when determining whether a resignation constitutes constructive discharge is "whether the employee can demonstrate that [s]he was discriminated against by h[er] employer to the point where a reasonable person in his position would have felt compelled to resign." *Davis v. Legal Servs. Ala., Inc.*, 19 F. 4th 1261, 1268 (11th Cir. 2021) (citing *Green v. Brennan*, 578 U.S. 555 (2016)). An employee's resignation "will [also] be deemed involuntary—and, thus, qualify as an adverse employment action—where the employer (1) forces the resignation by coercion or duress, or (2) obtains the resignation by deceiving or misrepresenting a material fact to the employee[.]" *D'Angelo v. WellStar Medical Group, LLC*, No. 1:18-cv-3873, 2020 WL 13660322, at *5 (N.D. Ga. July 7, 2020), *R&R adopted* 2020 WL 13660326 (N.D. Ga. Aug. 10, 2020) (quoting *Rossi v. Fulton Cnty., Ga.*, No. 1:10-CV-4254-RWS-AJB, 2013 WL 1213149, at *19 (N.D. Ga. Jan. 31, 2013)). There is a genuine dispute as to whether Plaintiff Updike tendered her resignation prior to the alleged ultimatum from Welch and whether Welch ever issued the ultimatum. (Doc. 14-7 at 82:15–83:3, 131:21–132:5; Doc. 14-10 at 139:25–15; *see* Doc. 17-1 at 5–6; *see* Doc. 14-1 at 6). Construing the facts in the light most favorable to Plaintiff, and assuming for purposes of this motion that the resignation was coerced, the question becomes whether there was a causal link between Plaintiff's Updike's allowance of the flex-schedule and her resignation. To establish a causal link, Plaintiff must show but-for causation. *See Frazier-White*, 818 F.3d at 1258 (citation omitted).

Plaintiff Updike has failed to establish a causal link. Plaintiff Updike relies on "close temporal proximity" to establish the causal link, arguing that Defendant's "demand that

14

[Plaintiff] Updike resign came within a month of her interview with the compliance team." (Doc. 17-1 at 11). The timing between the investigation and the resignation, however, is the incorrect comparison. The close temporal proximity must be between the protected activity and the adverse employment action. *See Thomas*, 506 F.3d at 1364 ("The burden of causation can be met by showing close temporal proximity between the statutorily protected activity and the adverse employment action." (citation omitted)). According to Plaintiff Updike, she offered the accommodation to Plaintiff Johnson in January of 2021 and made Welch aware of the accommodation within a week thereof. (Doc. 14-7 at 45:16–46:8). She did not resign, however, until December of 2021—almost a year later. Eleven months does not constitute close temporal proximity, and Plaintiff Updike offers no other evidence of causation. Moreover, there is no evidence that but for Plaintiff Updike offering Plaintiff Johnson an accommodation in the form of flex-time, she would have not have been fired.

Even if Plaintiff Updike had established causation, Defendant offered a legitimate non-discriminatory reason for terminating Plaintiff Updike—her admitted violation of, and failure to comply with, Defendant's policies. (*See* Doc. 14-1 at 16). While Plaintiff Updike argues that Defendant failed to flag or correct her failures earlier and applied the policies inconsistently, she does not deny that she was implicated in "189 instances of late reporting[;]" nor does she deny committing the other infractions for which she was disciplined. (Doc. 17-1 at 12).

Plaintiff Updike also cannot establish that the reason for her discipline was pretextual. "A reason cannot be proved to be a pretext *for discrimination* unless it is shown *both* that the reason was false, *and* that discrimination was the real reason." *Akridge v. Alfa Ins.*, 93 F.4th 1181, 1196 (11th Cir. 2024) (quoting *Ring v. Boca Ciega Yacht Club Inc.*, 4 F.4th 1149, 1163 (11th Cir. 2021)). "The pretext inquiry centers on the employer's belief, not the employee's beliefs and to be blunt about it, not on reality as it exists outside the decision maker's head." *Id.* (quoting *Todd*, 998 F.3d at 1218). As the Eleventh Circuit has "made clear[,] . . . an 'employer may fire an employee for a good reason, a bad reason, a reason based on erroneous facts, or for no reason at all, as long as its action is not for . . .

discriminatory reasons." *Akridge*, 93 F.4th 1181, 1195 (quoting *Owens v. Governor's Off. of Student Achievement*, 52 F.4th 1327, 1338 (11th Cir. 2022)). When considering an employer's proffered reasons for termination, the Court does not "sit as a super-personnel department that reexamines an entity's business decisions," and may not "analyze whether an employer's proffered reasons are prudent or fair." *Id.* (quoting *Owens*, 52 F.4th at 1338). Here, the reason for disciplining Plaintiff Updike was fair. That Plaintiff Updike does not believe it was fair is of no moment as she has failed to present evidence that she would not have been fired but-for her provision of the accommodation to Plaintiff Johnson.

Plaintiff Updike has not established a prima facie case of ADA retaliation, nor has she set forth a convincing mosaic "that would allow a jury to infer [retaliation]." *Akridge*, 93 F. 4th at 1198 (internal quotation marks omitted) (alteration in original) (quoting *Lewis v. City of Union City*, 934 F.3d 1169, 1185 (11th Cir. 2019). A "plaintiff will always survive summary judgment if she presents . . . a convincing mosaic of circumstantial evidence that would allow a jury to infer [unlawful retaliation]." *Id.* (quoting *Lewis*, 93 F.3d at 1185 (11th Cir. 2019)); *Berry v. Crestwood Healthcare LP*, 84 F.4th 1300, 1310–11 (11th Cir. 2023) ("an employee may prove retaliation with any circumstantial evidence that creates a reasonable inference of retaliatory intent[—s]ome of our precedents refer to this evidentiary approach as the 'convincing-mosaic framework[]'"). A plaintiff's mosaic "may be made up of, among other things, (1) suspicious timing, ambiguous statements . . . , and other bits and pieces from which an inference of discriminatory intent might be drawn; (2) systemically better treatment of similarly situated employees; and (3) evidence that the employer's justification is pretextual." *Id.* at 1198 (internal quotation marks omitted) (quoting *Lewis*, 934 F.3d at 1185). "At the end of the day, a retaliation plaintiff's 'mosaic' of evidence must still be enough to allow a reasonable jury to infer but-for causation." *Yelling v. St. Vincent's Health Sys.*, 82 F.4th 1329, 1342 (11th Cir. 2023) (citation omitted). As noted above, Plaintiff Updike has not established suspicious timing or pretext. Nor has Plaintiff Updike pointed to similarly situated employees who were treated more favorably. Plaintiff Updike has failed to establish a prima facie case of ADA retaliation or set forth a convincing mosaic of ADA retaliation, her claim fails as a matter of law.

16

## B. FMLA Retaliation

In the Complaint, Plaintiff Updike makes the conclusory allegation that she "engaged in protected activity by opposing an act or practice made unlawful under the FMLA, i.e., Defendant's retaliatory conduct regarding Plaintiff Johnson's opposition to practices made unlawful under the FMLA." (Doc. 1 ¶ 82). The FMLA "prohibits employers from retaliating against employees for engaging in protected activities." *Munoz*, 981 F.3d at 1274–75 (citing *Batson*, 897 F.3d at 1328); *see also Strickland*, 239 F.3d at 1206. Such activities include requesting FMLA leave, filing any FMLA-related charge, instituting any FMLA-related proceeding, or giving information regarding or testifying in an FMLA-related inquiry. *See* 29 U.S.C. § 2615 (a)(2), (b). In order to prove retaliation under the FMLA, "an employee must show that h[er] employer *intentionally* discriminated against h[er] for exercising an FMLA right." *Martin*, 543 F.3d at 1267 (first citing 29 U.S.C. § 2615(a)(2); and then citing 29 C.F.R. § 825.220(c)).

Plaintiff Updike asserts that she engaged in FMLA protected activity when she opposed "Defendant's retaliatory conduct regarding Plaintiff Johnson" by "defen[ding] [Plaintiff] Johnson's attendance history during the compliance investigation." (Doc. 1 at 77; Doc. 17-1 at 8). According to Plaintiff Updike, her defense of Plaintiff Johnson "had the inevitable effect of challenging Wilson's arguably retaliatory intentions and the cause-effect chain they created." (Doc. 17-1 at 8). Plaintiff Updike acknowledges that she played no role in the investigation that led to Plaintiff Johnson's termination. (Doc. 14-7 at 89:2–25). Rather, Plaintiff Updike testified that, after Plaintiff Johnson's termination, she told Welch that she "didn't agree with the outcome of the investigation[.]" (*Id.* at 89:2–5). During her compliance interview, she again expressed her disagreement and offered to provide records "that would show that there was no mismanagement[.]" (*Id.* at 89:5–11). After her conversation with Welch, Plaintiff Updike contacted Miller, who worked in compliance investigations, and stated that she "wanted the opportunity to provide rebuttal to the investigation." (*Id.* at 90:14–91:5).

Plaintiff Updike acknowledges that none of this activity was performed in defense of Plaintiff Johnson. Rather, when asked, "What was your understanding of the information

17

that you thought you needed to submit to bolster [Plaintiff] Johnson's defense?", Plaintiff Updike responded, "I was not trying to bolster and defend [Plaintiff] Johnson. I was trying to defend myself." (*Id.* at 95:10–15). More importantly, none of Plaintiff Updike's actions had any relation to practices made unlawful by the FMLA. First, Plaintiff Updike was not involved when Plaintiff Johnson requested and received approval for FMLA leave in October of 2021. (*Id.* at 50:1–12). With regard to January 2021, Plaintiff Updike testified that "[she] didn't feel like the FMLA policy should have been in play at all" and that "there was no FMLA needed. [Plaintiff] Johnson . . . never requested nor indicated she wanted to be on FMLA." (*Id.* at 95:16–96:2). As there were no FMLA-related actions, Plaintiff Updike's actions cannot be said to have been in defense of any such activities. Accordingly, Plaintiff Updike has failed to establish that she engaged in an FMLA protected activity, and Defendant is entitled to judgment as a matter of law.

## II.    ADA Interference Claim

In her Response, Plaintiff Updike raises an ADA interference claim for the first time. (Doc. 17-1 at 14–18; *see* Doc. 1). The Eleventh Circuit has held that "[d]espite the 'liberal pleading standard for civil complaints,' plaintiffs may not 'raise new claims at the summary judgment stage.'" *White v. Beltram Edge Tool Supply, Inc.*, 789 F.3d 1188, 1200 (11th Cir. 2015) (quoting *Gilmour v. Gates, McDonald & Co.*, 382 F.3d 1312, 1314 (11th Cir. 2004) (per curiam)). Instead, "[a]t the summary judgment stage, the proper procedure for plaintiffs to assert a new claim is to amend the complaint . . . ." *Id.* (quoting *Gilmour*, 382 F.3d at 1315) (internal quotation marks omitted)). As it is impermissible for Plaintiff to amend her complaint "through argument in a brief opposing summary judgment[,]" the Court declines to consider the ADA interference claim. *Id.*

## CONCLUSION

For the reasons stated above, Defendant's Motion for Summary Judgment as to Plaintiff Updike (Doc. 14) is **GRANTED**.

**SO ORDERED**, this 31st day of March, 2026.

/s/ Leslie A. Gardner
**LESLIE A. GARDNER, CHIEF JUDGE**
**UNITED STATES DISTRICT COURT**