IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
ALBANY DIVISION

ASHLEY JOHNSON and JILL UPDIKE, :
 :
  Plaintiffs, :
 :
v. : CASE NO.: 1:22-CV-51 (LAG)
 :
PHOEBE PUTNEY HEALTH SYSTEM :
INC., :
 :
  Defendant. :
_____ :

**ORDER**

Before the Court is Defendant's Motion for Summary Judgment as to Plaintiff Ashley Johnson. (Doc. 15). For the reasons below, Defendant's Motion is **GRANTED in part and DENIED in part**.

**PROCEDURAL BACKGROUND**

On April 26, 2022, Plaintiffs Ashley Johnson and Jill Updike filed this action against Defendant Phoebe Putney Health System Inc., their former employer. (Doc. 1). Plaintiff Johnson alleges "unlawful employment practices by Defendant[,]" including violations of the Americans with Disability Act of 1990 (ADA), 42 U.S.C. § 12101 *et seq.* and the Family Medical Leave Act (FMLA), 29 U.S.C. § 2601 *et seq.* (*Id.* ¶ 1). Specifically, Plaintiff Johnson alleges that she was "denied accommodations and terminated by Defendant based on her ADA-qualifying medical disabilities . . . , and that Defendant interfered with the exercise of her lawful rights under the FMLA." (*Id.*). Plaintiff Johnson further alleges that she was "subjected to retaliation for engaging in protected activities under the ADA and the FMLA." (*Id.*). As remedy, Plaintiff Johnson seeks back pay, front pay, lost benefits, noneconomic compensatory damages, punitive damages under the ADA, attorneys' fees, costs of litigation, and "injunctive and declaratory relief as appropriate." (*Id.*). On May 1, 2023, Defendant filed the subject Motion for Summary Judgment as to

Plaintiff Johnson's claims. (Doc. 15). The Parties timely filed their respective Responses and Replies, and the Motion is now ripe for review. (Docs. 16, 19); *see* M.D. Ga. L.R. 7.3.1(A).

## LEGAL STANDARD

Under Federal Rule of Civil Procedure 56(a), summary judgment is appropriate where "the evidence shows 'that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *Gogel v. Kia Motors Mfg. of Ga., Inc.*, 967 F.3d 1121, 1134 (11th Cir. 2020) (en banc) (quoting Fed. R. Civ. P. 56(a)). "A genuine issue of material fact does not exist unless there is sufficient evidence favoring the nonmoving party for a reasonable jury to return a verdict in its favor." *Chapman v. AI Transp.*, 229 F.3d 1012, 1023 (11th Cir. 2000) (en banc) (quoting *Haves v. City of Miami*, 52 F.3d 918, 921 (11th Cir. 1995)). "An issue of fact is 'material' if it is a legal element of the claim under the applicable substantive law which might affect the outcome of the case." *Allen v. Tyson Foods, Inc.*, 121 F.3d 642, 646 (11th Cir. 1997) (citations omitted). "An issue of fact is 'genuine' if the record taken as a whole could lead a rational trier of fact to find for the nonmoving party." *Felts v. Wells Fargo Bank, N.A.*, 893 F.3d 1305, 1311 (11th Cir. 2018) (quoting *Hickson Corp. v. N. Crossarm Co.*, 357 F.3d 1256, 1259–60 (11th Cir. 2004)). At summary judgment, the Court views the evidence "in the light most favorable to the non-moving party" and resolves factual disputes for the nonmoving party when doing so is supported by sufficient evidence. *Gogel*, 967 F.3d at 1134 (quoting *Thomas v. Cooper Lighting, Inc.*, 506 F.3d 1361, 1363 (11th Cir. 2007)); *Whitehead v. BBVA Compass Bank*, 979 F.3d 1327, 1328 (11th Cir. 2020).

The movant bears the initial burden of showing, by reference to the record, that there is no genuine issue of material fact. *See Shaw v. City of Selma*, 884 F.3d 1093, 1098 (11th Cir. 2018); *Whitehead*, 979 F.3d at 1328. The movant can meet this burden by presenting evidence showing that there is no genuine dispute of material fact or by demonstrating that the nonmoving party has failed to present evidence in support of some element of its case on which it bears the ultimate burden of proof. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322–24 (1986); *McGee v. Sentinel Offender Servs., LLC*, 719 F.3d 1236, 1242 (11th Cir.

2013) (per curiam). If the movant meets their initial burden, the nonmoving party must demonstrate that there is a genuine dispute for trial. *Whitehead*, 979 F.3d at 1328 (citing *Celotex Corp.*, 447 U.S. at 324). The nonmovant must "go beyond the pleadings and [] present competent evidence in the form of affidavits, answers to interrogatories, depositions, admissions and the like, designating specific facts showing a genuine issue for trial." *Lamar v. Wells Fargo Bank*, 597 F. App'x 555, 557 (11th Cir. 2014) (per curiam) (citing *Celotex Corp.*, 477 U.S. at 324). "All material facts contained in the movant's statement which are not specifically controverted by specific citation to particular parts of materials in the record shall be deemed to have been admitted, unless otherwise inappropriate." M.D. Ga. L.R. 56; *see Mason v. George*, 24 F. Supp. 3d 1254, 1260 (M.D. Ga. 2014).

## FACTUAL BACKGROUND[1]

Plaintiff Ashley Johnson was hired by Defendant Phoebe Putney Health System, Inc. as a Benefits/Leave of Absence Specialist on January 8, 2018. (Doc. 14-2 ¶ 1; Doc. 16-2 ¶ 1). On April 14, 2019, Plaintiff Johnson's position changed to the role of Compensation Analyst. (Doc. 14-2 ¶ 1; Doc. 16-2 ¶ 1). As a Compensation Analyst, Plaintiff Johnson's responsibilities "included examining market data, ensuring pay grades for [Defendant's] employees were in line with market data, and reviewing job

---

[1]    The Court derives the relevant facts from the Defendant's Statement of Material Facts (Doc. 14-2), Plaintiff's respective response (Doc.16-2), and the record. Defendant simultaneously filed Motions for Summary Judgment against both Plaintiffs in this matter. (Docs. 14, 15; *see* Docket). Defendant filed one Statement of Material Facts in support of both Motions. (*See* Doc. 14-2; Doc. 15-1 at 1 n.1). Local Rule 56 requires that "[t]he respondent to a motion for summary judgment . . . attach to the response a separate and concise statement of material facts, numbered separately to which the respondent contends there exists a genuine dispute to be tried. Response shall be made to each of the movant's numbered material facts. All material facts contained in the movant's statement which are not specifically controverted by specific citation to particular parts of materials in the record shall be deemed to have been admitted, unless otherwise inappropriate." M.D. Ga. L.R. 56 (emphasis omitted). Plaintiffs Updike and Johnson each filed separate Statements of Material Facts in their Responses to the respective Motions, but neither Statement of Material Facts is responsive to the Statement of Material Facts submitted by Defendant as each Plaintiff failed to controvert the facts asserted in Defendant's Statement of Material Facts by specific citation to the record. (*See* Docs. 14-2, 16-2, 17-2). Accordingly, the facts set forth in Defendant's Statement of Material Facts (Doc. 14-2) are deemed admitted where appropriate.

descriptions." (Doc. 14-2 ¶ 1). Throughout her employment with Defendant, Plaintiff Johnson was a salaried, "exempt employee[.]" (Doc. 14-2 ¶ 2; Doc. 16-2 ¶ 19).

On August 8, 2020, Plaintiff Jill Updike started work at Defendant Phoebe Putney Health System, Inc. as the Corporate Director of Compensation & Benefits. (Doc. 14-2 ¶ 3; Doc. 17-2 ¶ 1). In her role, Plaintiff Updike "oversaw the benefits and leave administration process for [Defendant's] employees as well as the compensation department" and became Plaintiff Ashley Johnson's "direct supervisor." (Doc. 14-2 ¶ 3; Doc. 17-2 ¶ 2). Plaintiff Updike "relied heavily" on Plaintiff Johnson to "make sure that the [compensation] department was running as smoothly as it could[.]" (Doc. 14-2 ¶ 4; Doc. 14-7 at 55:16–22). From the time Plaintiff Johnson started her job in 2018 to late 2020, Plaintiff Johnson worked in person. (Doc. 16-2 ¶¶ 1, 12; Doc. 14-6 at 48:20–49:1). At the end of 2020, Plaintiff Johnson, under Plaintiff Updike's direct supervision, intermittently began to work remotely due to the pandemic. (Doc. 14-2 ¶ 20; Doc. 14-6 at 48:20–49:6). In early 2021, Plaintiff Johnson told Plaintiff Updike that she was "struggling with issues related to depression and anxiety" and that the medication she was prescribed to address these issues caused drowsiness. (Doc. 14-2 ¶¶ 4, 11–12, 14; Doc. 16-2 ¶¶ 10–11; Doc. 17-2 ¶ 3). As a result, in January 2021, Plaintiff Updike permitted Plaintiff Johnson to work "a flex-time schedule" and to work remotely. (Doc. 14-2 ¶¶ 5, 12, 20; Doc. 16-2 ¶ 12; Doc. 17-2 ¶ 4).

The typical workday hours for Plaintiff Johnson's department were 8:00 a.m. to 5:00 p.m. (Doc. 14-2 ¶ 8; Doc. 14-12 at 19:23–25). Plaintiff Johnson's flex-time schedule allowed her to "vary her work hours, sometimes starting the day later, or taking downtime during the day, and working after the close of normal business hours and during evenings." (Doc. 14-2 ¶ 8; Doc. 16-2 ¶ 12; Doc. 17-2 ¶ 4). While working on the flex-time schedule, Plaintiff Updike did not keep track of Plaintiff Johnson's hours, nor did she require Plaintiff Johnson to clock in each day she worked. (Doc. 14-2 ¶ 10). Instead, Plaintiff Updike reminded Plaintiff "Johnson at the end of each pay period that [Plaintiff] Johnson needed to put in time for the entire period." (*Id.* ¶¶ 10, 21, 24; *see* Doc. 14-13). As her immediate supervisor, Plaintiff Updike "had to approve all of [Plaintiff] Johnson's time entries." (Doc.

14-2 ¶ 24). When Plaintiff Updike texted Plaintiff "Johnson at the end of a pay period and just prior to her submission of time to the payroll department[,]" Plaintiff Updike "approve[d] whatever was entered by [Plaintiff] Johnson . . . without question and without any verification as to whether work had been performed or the amount of work being performed." (*Id.*). Plaintiff Johnson did not "badge in" in compliance with either the policy or the practice. (Doc. 14-2 ¶¶ 10, 21; Doc. 14-7 at 94:17–21). While working on the flex-time schedule, Plaintiff Updike and Plaintiff Johnson did not have any written or verbal communication about Plaintiff Johnson's work hours. (Doc. 14-2 ¶ 20; Doc. 14-7 at 42:22–43:9). Between January 1, 2021 and October 25, 2021, Plaintiff Johnson failed to badge in on days that she claimed to have worked 151 times. (Doc. 14-2 ¶ 22; Doc. 14-15). These 151 policy violations "over approximately 205 non-holiday workdays" account for 74% of the days Plaintiff Johnson worked. (*Id.*).

Defendant requires exempt employees to "clock in on each day they work[]." (Doc. 14-2 ¶¶ 10, 21; Doc. 16-2 ¶ 20). Every new employee at Defendant participates in an orientation during which they are informed about Defendant's policies and procedures. (Doc. 14-2 ¶¶ 17–18; Doc. 14-1 at 38:18–39:6). Per policy, exempt employees are paid for the entire day when they badge in, even "if someone works for half-an-hour and does nothing else the rest of the day." (Doc. 14-10 at 32:1–9; Doc. 14-2 ¶ 21). Employees who "manipulat[e] [the] system and tak[e] advantage of it to basically clock in and then take the rest of the day off" could be subject to discipline. (Doc. 14-10 at 32:21–33:6; Doc. 14-2 ¶ 21). Failing to clock in "is a terminable offense." (Doc. 14-2 ¶ 23; Doc. 14-11 at 73:13–18). Although reviewing the company's policies and procedures with her subordinates was a part of Plaintiff Updike's responsibilities, she did not instruct Plaintiff Johnson to review the company policies listed on Defendant's intranet. (Doc. 14-2 ¶ 18; Doc. 14-7 at 28:22–29:3, 51:17–22). While Defendant's policy required employees to "badge in once per day[,]" the compensation department practice was to badge in "at a minimum biweekly." (Doc. 14-2 ¶ 10; Doc. 14-7 at 94:14–16; Doc. 17-2 ¶ 7).

Defendant has no specific policy on flex time and department managers are permitted to allow a flex-time schedule at their discretion. (Doc. 14-2 ¶ 15; Doc. 14-11 at

68:6–11; Doc. 14-10 at 36:22–24). The Parties dispute whether the flex-time accommodation was communicated to and approved by the Corporate Human Resources or the Vice President of Human Resources. (Doc. 14-2 ¶¶ 5–6, 15; Doc. 16-2 ¶¶ 13, 17; Doc. 17-2 ¶ 5).

Tony Welch (Welch), the Chief HR Officer, had "ultimate authority to approve or deny an ADA-based accommodation at Phoebe[,]" and Plaintiff Updike reported to Welch. (Doc. 14-2 ¶ 16; Doc. 14-11 at 28:21–24, 84:15–16; Doc. 17-2 ¶ 2). Welch testified that sometime in the fall of 2021, while on a call with Plaintiff Updike and Melinda Wilson (Wilson), who became Plaintiff Johnson's direct supervisor in August of 2021, Plaintiff Updike told Welch that Plaintiff Johnson "had missed about a month" of work, at which point Welch asked "specifically how much FMLA time [Plaintiff Johnson] ha[d] left[.]" (Doc. 14-10 at 28:19–29:3, 29:13–19, 35:6–15). Plaintiff Updike "responded that she had not put [Plaintiff Johnson] on FMLA [leave]." (*Id.* at 29:2–3). Welch further testified that Plaintiff Updike never informed him "that the issues were serious enough to . . . warrant FMLA leave" and that it was Plaintiff Updike's responsibility to request FMLA leave on Plaintiff Johnson's behalf. (*Id.* at 97:11–15).

Plaintiff Johnson's supervision changed on August 9, 2021, when Defendant hired Wilson as a Total Rewards Manager, and Wilson became Plaintiff Johnson's direct supervisor. (Doc. 14-2 ¶ 27). Plaintiff Updike "maintained control of approving [Plaintiff] Johnson's time card for a while after []Wilson started" even though Wilson "was actually managing the day to day." (Doc. 14-2 ¶ 27; Doc. 14-7 at 78:11–22). When Wilson was hired, Plaintiff Johnson (1) "told her the work hours for the department were 8:00 a.m. to 5:00 p.m.[,]" (2) "taught [her] how to enter her time," and (3) "informed her she needed to use the Quick Badge process and clock in daily." (Doc. 14-2 ¶¶ 28, 31; Doc. 14-12 at 19:16–21, 19:23–20:6, 106:16–107:13). "During the first two months following []Wilson's hire, there were many times that []Wilson could not get in touch with [Plaintiff] Johnson at all during the core business hours, even though [Plaintiff] Johnson was supposed to have been working." (Doc. 14-2 ¶ 29; Doc. 14-12 at 20:11–24:3). In early fall of 2021, when Wilson questioned Plaintiff Updike about Plaintiff Johnson's availability throughout the

workday and the impact on customer service, Plaintiff Updike told Wilson that Plaintiff Johnson "had some health conditions" and that she had been permitted "to be flexible in her scheduling[.]" (Doc. 14-2 ¶ 30; Doc. 14-7 at 35:21–36:4, 36:5–20). In late October 2021, Wilson "assume[d] day-to-day responsibility and supervision of [Plaintiff] Johnson." (Doc. 14-2 ¶ 32; Doc. 14-7 at 50:10–12). Wilson, however, was not granted access "as an approver in the Time and Attendance System" for Plaintiff Johnson until November 10, 2021. (Doc. 14-2 ¶ 48; Doc. 14-19 at 3).

On October 21, 2021, during a discussion about Plaintiff Johnson's personal family issues, health issues, and work performance, Wilson advised Plaintiff Johnson that "the frequency of the callouts[,]" and "her frequent claims that she could not work because '[she's] not feeling well today,' or because '[her] computer is not working' could jeopardize [Plaintiff] Johnson's continued employment." (Doc. 14-2 ¶ 34; Doc. 14-12 at 38:17–21, 41:7–16, 42:16–20; Doc. 14-17 at 2; Doc. 16-5). Wilson suggested that Plaintiff Johnson take FMLA leave. (Doc. 16-5; Doc. 14-17 at 2). The next day, on October 22, 2021, Plaintiff Johnson advised Wilson that she would be taking leave under the Family Medical Leave Act. (Doc. 16-2 ¶ 25; Doc. 14-17 at 2; Doc. 14-6 at 107:25–108:7). During Plaintiff Johnson and Wilson's one-on-one, Plaintiff Johnson and Wilson discussed expectations for Plaintiff Johnson upon her return, including discussions regarding Plaintiff Johnson's work and the need for Plaintiff Johnson to clock in daily using the Quick Badge system. (Doc. 14-2 ¶ 35; Doc. 14-12 at 96:21–97:13; Doc. 14-17 at 3). Despite previous discussions about the need to clock in daily, Plaintiff Johnson had not clocked in for the prior pay period. (Doc. 14-17 at 3; Doc. 14-2 ¶ 35).

Following the one-on-one conversation on October 22, 2021, Wilson and Plaintiff Johnson met with the team for a hand-off meeting to discuss the transition of Plaintiff Johnson's responsibilities during Plaintiff Johnson's leave. (Doc. 14-17 at 2–3; Doc. 16-5; Doc. 14-6 at 108:20–109:12). During the hand off meeting, while discussing circumstances in which someone "needed to take a leave of absence" and could "not continue to do the work[,]" Wilson stated that "their status would be . . . essentially demoted." (Doc. 14-6 at 110:13–16). Wilson stated:

a perfect example of this scenario would be if the team had a Comp Analyst that was not performing well and couldn't handle the workload they were given so they decide to go [parttime]. When they want to come back full time[,] they can't handle the stress of the work so we will demote them and hire them on full time[.]

(Doc. 16-2 ¶ 28; Doc. 16-5; Doc. 14-2 ¶ 40). "Almost immediately after" the meeting, Plaintiff Johnson filed a complaint with Welch. (Doc. 14-6 at 111:10–12; Doc. 16-2 ¶ 29). Plaintiff Johnson testified that she called Welch to report her concerns about the comment Wilson made during the hand-off meeting. (Doc. 14-6 at 112:5–9).

Plaintiff Johnson went out on FMLA leave on October 25, 2021, and submitted a Certification of Health Care Provider for Employee's Serious Health Condition on November 17, 2021. (Doc. 14-2 ¶ 50; Doc. 14-20). That same day, Haynes informed Wilson[2] that Plaintiff Johnson had "submitted a concern to compliance about a conversation during [the] handoff meeting[;]" and Wilson e-mailed Haynes a chronological description of her meetings with Plaintiff Johnson regarding her leave. (Doc. 14-2 ¶¶ 36, 40; Doc. 14-12 at 46:22–47:1; *see* Doc. 16-5; *see* Doc. 14-17). On October 26, 2021, Plaintiff Johnson e-mailed Haynes regarding Wilson's comments during the handoff meeting. (Doc. 16-2 ¶ 28; Doc. 16-5; Doc. 14-2 ¶ 40). Haynes let Plaintiff Johnson know that she would look into it, and conducted an investigation of the incident. (Doc. 14-6 at 119:4–5; Doc. 14-11 at 111:2–16; Doc. 16-2 ¶ 31). Haynes interviewed Wilson and asked her to "walk [her] through the entire meeting from beginning to end, and then [she] circled back . . . [to] the comments that [Plaintiff Johnson] [was] alleging." (Doc. 14-11 at 113: 12–18). Haynes also asked "Wilson if she made any comment to [Plaintiff Johnson] that [someone's] being away from th[e] company could jeopardize [their] job." (*Id.* at 114:10–16). Wilson "admitted that she had offered the example of the struggling compensation analyst" and had "raised concerns to [Plaintiff] Johnson about the challenges of managing [her] workload during FMLA leave." (Doc. 16-2 ¶ 31; *see* Doc. 14-11 at 114:19–6).

---

[2] While it is not clear from the record, the Court presumes that Welch advised Haynes of Plaintiff's complaint.

Ultimately, Haynes determined that, while the team members present at the meeting heard the example about the Comp Analyst, they "had no knowledge of [Plaintiff Johnson's] going on leave, so they did not conclude . . . that the comment that was made was directed at [Plaintiff Johnson]." (Doc. 14-2 ¶ 41; Doc. 14-11 at 119:14–18, 119:19–22). Haynes, therefore, determined that during that meeting "Wilson had not targeted or intended to infer anything toward or concerning [Plaintiff] Johnson." (Doc. 14-2 ¶ 41; Doc. 14-11 at 119:14–18, 119:19–22).

On November 4, 2021, Haynes anonymously reported concerns regarding a number of people and compliance issues to Defendant's Compliance and Ethics Department. (Doc. 14-11 at 143:2–24; Doc. 14-2 ¶ 42). The report included the allegation that "earlier [in 2021] [Plaintiff] Updike allowed [Plaintiff] Johnson to take off three to four weeks but continued to pay her without making her use any accrued paid time off." (Doc. 14-2 ¶ 42; Doc. 14-11 at 144:14–24; *see* Doc. 14-22). Haynes admitted to using some of the information that Wilson submitted to her in response to Plaintiff Johnson's complaint to form the basis of her report to the Compliance Department. (Doc. 14-11 at 150:20–151:8, 156:2–20). Janine Sarti, in-house legal counsel for Defendant, Jonathan McGuire, then-Corporate Director and Compliance and Privacy Officer, and Josh Miller, then-Chief Compliance Officer investigated Haynes' report, conducting interviews with nine employees, reviewing the API timecard reports and email activity logs for Plaintiff Johnson, and reviewing Defendant's Pay Practices Policy. (Doc. 14-22 at 3). The report on the compliance investigation sets forth the following findings:

> a. A review of the API documentation revealed that all but nine days during the calendar year to date [Plaintiff Johnson] entered regular time. The other nine days were entered as PTO. [Plaintiff Updike] approved all pay periods with the exception of three, which were processed without approval.
>
> b. Five days indicated by []Wilson that [Plaintiff Johnson] was off, were not properly entered as PTO into API but rather Regular Time by [Plaintiff Johnson]. Regular time was also entered for the Independence day holiday on which the office was closed on July 5th.

9

> c. [Plaintiff Johnson] more times than not entered a pay period's worth of clocking on one day, typically the last day of the pay period.

(Doc. 14-22 at 3).

On November 29, 2021, Plaintiff Johnson returned from leave and met with Wilson and Haynes. (Doc. 14-2 ¶ 55; *see* Doc. 14-21). During the meeting, they discussed expectations moving forward, including attendance expectations, managing computer issues, meeting deadlines, and compensation logs. (Doc. 14-2 ¶ 55; Doc. 14-21 at 3–4). Plaintiff Johnson was also informed that she "was being investigated for being paid for days [she] took off work." (Doc. 16-3 ¶ 22). On November 30, 2021, the Compliance and Ethics Department recommended that Plaintiff Johnson "receive a Level 4, Termination for multiple instances of entering regular time when PTO or no pay should have been entered." (Doc. 14-22 at 2; Doc. 14-2 ¶ 57).

According to Welch, Defendant had a progressive disciplinary policy that functioned as follows:

> Level 1 is basically like a verbal warning. *The levels may or may not be used depending on the severity of the infraction.* Like we typically go through all of the levels for attendance. So after, say, six absences, you get a verbal or a Level 1. And then after eight absences, you get a written. And each time you're, you know, encouraged to do better to get out of that disciplinary process.
>
> The things that are more severe, you know, like for fighting, you're not going to get a verbal for fighting. You're probably going to be fired on the spot. For stealing, you're probably going to be fired on the spot. *So it depends on the severity of the infraction and that's in the determination of [Defendant].*

(Doc. 14-10 at 119:8–23 (emphasis added)). He further explained that "Level 3 is a final warning" and "Level 4 is termination." (*Id.* at 119:25–120:2). Welch confirmed that "the normal discipline for . . . falsifying a time card is Level 2[,]" but described the number of times Plaintiff Johnson falsified her time card as "significant" and recalled that it was "more than 50 percent of the time she did not work and claimed she did." (*Id.* at 120:20–

25, 121:8–13). Welch explained that "[a]n unapproved [absence] and falsifying time are not in the same category[.]" (*Id.* at 122:13–14).

On December 13, 2021, Plaintiff Johnson "was informed by the Chief of the Human Resources Department Tony Welch that [she] was being terminated for time theft." (Doc. 16-3 ¶ 23). On February 22, 2022, Plaintiff Johnson filed a Charge of Discrimination with the EEOC for retaliation and disability discrimination. (Doc. 1-1).

## DISCUSSION

Plaintiff Johnson asserts claims for retaliation in violation of the Americans with Disabilities Act of 1990 (ADA), as amended, 42 U.S.C.A. § 12101 *et seq.*, discrimination under the ADA,[3] and interference and retaliation in violation of the FMLA. (Doc. 1 ¶¶ 53–75). Defendant argues that it is entitled to summary judgment as to Plaintiff Johnson's claims because (1) she "was terminated from employment for committing 151 violations of [Defendant's] time-keeping policies in the 205 workdays between January 1, 2021, and the time [she] went out on FMLA leave"; (2) she "was not disabled pursuant to the provisions of the ADA"; (3) her "medical conditions did not cause her to be substantially limited in a major life activity as compared to most people in the general population"; (4) she received a "flex-schedule 'accommodation'" and "was offered FMLA leave by [Defendant] despite . . . not having any medical corroboration of a serious medical condition"; and (5) Defendant "had legitimate, non-discriminatory, non-retaliatory reasons for termination Plaintiff's employment," including repeated violations of the time-keeping policies and time theft. (Doc. 15 ¶¶ 2–9). Plaintiff Johnson argues that her depression and anxiety are actual disabilities that substantially limited a major life activity and that the Compliance and Ethics Department's investigation was in retaliation to her complaint against Wilson, resulting in "a retaliatory discharge." (Doc. 16; Doc. 16-1 at 17).

---

[3]    In the Complaint, Plaintiff Johnson asserts a claim for "failure to accommodate under the ADA[.]" (Doc. 1 ¶¶ 58–66). Plaintiff Johnson explicitly abandoned that claim in her Response to the Motion for Summary Judgment. (Doc. 16-1 at 3, 9 ("Johnson does not pursue her accommodation claim[.]")).

11

## I.    ADA Discrimination Claim

When a plaintiff does not offer any direct evidence of discrimination, they may prove their claim through circumstantial evidence using the familiar *McDonnell Douglas* burden shifting framework, beginning with the plaintiff's *prima facie* case. *Wascura v. City of S. Miami*, 257 F.3d 1238, 1242 (11th Cir. 2001); *see McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). "To establish a prima facie case of employment discrimination under the ADA, a plaintiff must show that at the time of the adverse employment action, she (1) had a disability, (2) was a qualified individual, and (3) was subjected to unlawful discrimination because of her disability." *Batson v. Salvation Army*, 897 F.3d 1320, 1326 (11th Cir. 2018). To meet the third requirement, a plaintiff must show that the adverse employment action would not have occurred but for her disability. *See Akridge v. Alfa Ins. Co.*, 93 F. 4th 1181, 1192–94 (11th Cir. 2024) (explaining that the amended "on the basis of disability" language, which replaced "because of," language in the ADA did not change the requirement to show but-for causation). In other words, Plaintiff must demonstrate that the termination was caused by her disability. *See Holly v. Clairson Industries, LLC*, 492 F. 3d 1247, 1263 n. 17 (11th Cir. 2007).

In the alternative, "a plaintiff can survive summary judgment if [s]he presents a convincing mosaic of circumstantial evidence that would allow a jury to infer intentional discrimination." *Jones v. Georgia Ports Authority*, No. 22-12844, 2024 WL 470347, at *4 (11th Cir. Feb. 7, 2024) (per curiam) (citing *Smith v. Lockheed-Martin Corp.*, 644 F.3d 1321, 1328 (11th Cir. 2011)); *see also Todd v. Fayette Cnty. Sch. Dist.*, 998 F.3d 1203, 1215 (11th Cir. 2021); *Walls v. Lowe's Home Ctrs., LLC*, 789 F. App'x 852, 854 (11th Cir. 2019) (per curiam) (citing *Chapter 7 Tr. v. Gate Gourmet, Inc.*, 683 F.3d 1249, 1255 (11th Cir. 2012)). A plaintiff may make such a showing by pointing to evidence "such as '(1) suspicious timing, ambiguous statements, or other information from which discriminatory intent may be inferred, (2) systematically better treatment of similarly situated employees, and (3) pretext.'" *Id.* (quoting *Jenkins v. Nell*, 26 F.4th 1243, 1250 (11th Cir. 2022) (internal quotation marks omitted)).

### A. Prima Facie Case

As discussed below, Plaintiff Johnson has not set forth a prima facie case of discrimination under the ADA.

#### 1. Disability

Under the ADA, a "disability" means "a physical or mental impairment that substantially limits one or more major life activities . . . a record of such impairment . . . or [] being regarded as having such an impairment." 42 U.S.C. § 12102(1). Congress has directed courts to construe the definition of disability "in favor of broad coverage of individuals under [the ADA], to the maximum extent permitted by the terms of [the ADA]." *Id.* § 12102(4)(A). "The question of whether an individual meets the definition of disability . . . should not demand extensive analysis." 29 C.F.R. § 1630.1(c)(4). Rather, Congress's express intent was "that the primary object of attention in cases brought under the ADA should be whether entities covered under the ADA have complied with their obligations." ADA Amendments Act of 2008 (ADAAA), Pub. L. No. 110-335, § 2(b)(5), 122 Stat. 3553, 3554. "Congress intended that the establishment of coverage under the ADA should not be overly complex nor difficult, and expected that the ADAAA will lessen the standard of establishing whether an individual has a disability . . . ." *Mazzeo v. Color Resolutions Int'l, LLC*, 746 F.3d 1264, 1268 n.2 (11th Cir. 2014) (citations, alterations, and internal quotation marks omitted). Importantly, "[a]n impairment need not prevent, or significantly or severely restrict, the individual from performing a major life activity in order to be considered substantially limiting." 29 C.F.R. § 1630.2(j)(1)(ii); *see also* ADAAA § 2(b)(4) (stating Congress's purpose "to reject the standards enunciated by the Supreme Court in *Toyota Motor Manufacturing, Kentucky, Inc, v. Williams*, 524 U.S. 184 (2002), that the terms 'substantially' and 'major' in the definition of disability under the ADA 'need to be interpreted strictly to create a demanding standard for qualifying as disabled,' and that to be substantially limited in performing a major life activity under the ADA 'an individual must have an impairment that prevents or severely restricts the individual from doing activities that are of central importance to most people's daily lives.'").

13

It is undisputed that Plaintiff Johnson was diagnosed with depression and anxiety. (*See* Doc. 15-1 at 5; Doc. 16-1 at 5). During an August 9, 2019, doctor's appointment, Plaintiff Johnson complained of "work-related anxiety" and was diagnosed with "adjustment disorder with anxious mood." (Doc. 15-2 at 5–6). Plaintiff Johnson described a similar condition in her affidavit, stating "[b]eginning in 2019, [she] began to experience symptoms of depression and anxiety, for which [she] began receiving therapy." (Doc. 16-3 ¶ 3). Plaintiff Johnson testified during her deposition that she was formally diagnosed with depression and anxiety "[a]bout October 2020." (Doc. 14-6 at 32:17–20). Plaintiff Johnson was prescribed Xanax and Zoloft to manage her symptoms. (*Id.* at 34:22–35:7). Generalized anxiety disorder and depression are considered to be "impairments" under the ADA because "mental impairment means . . . [a]ny mental or psychological disorder." 29 C.F.R. § 1630.2(h).

Whether Plaintiff Johnson was actually disabled, then, turns on whether her depression and anxiety disorders substantially limited one or more major life activities; and the Court compares the individual's ability to perform the activity "to most people in the general population." *Id.* § 1630.2(j)(1)(ii). The functional limitation required is lower than the standard applied prior to the ADAAA, and the analysis usually does not require medical, scientific, or statistical evidence. *Id.* § 1630.2(j)(1)(iv)–(v). In fact, Congress passed the ADAAA "to, among other things, promulgate a more liberal standard of the term 'disabled,' making it significantly easier for a plaintiff to show disability." *Coker v. Enhanced Senior Living, Inc.*, 897 F. Supp. 2d 1366, 1374 (N.D. Ga. 2012) (quoting *Barlow v. Walgreen Co.*, No. 8:11-cv-71-T-30EAJ, 2012 WL 868807, at *4 (M.D. Fla. Mar. 14, 2012)). "An impairment that is episodic . . . is a disability if it would substantially limit a major life activity when active," and "[t]he determination of whether an impairment substantially limits a major life activity shall be made without regard to the ameliorative effects of mitigating measures such as . . . medication." *Id.* § 1630.2(j)(1)(vii); 42 U.S.C. § 12102(4)(E)(i); *see also* ADAAA § 2(b)(2) (stating Congress's purpose "to reject the requirement enunciated by the Supreme Court in *Sutton v. United Air Lines, Inc.*, 527 U.S. 471 (1999) and its companion cases that whether an impairment substantially limits a major

14

life activity is to be determined with reference to the ameliorative effects of mitigating measures . . .”). Major life activities “include, but are not limited to, caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working.” 42 U.S.C. § 12102(2)(A). An impairment need only limit one major life activity to be a disability. *Id.* § 12102(4)(C).

Plaintiff Johnson testified that she experiences “difficulty breathing,” a sensation that her chest is closing, and “panic attack[s]” during spells of anxiety. (Doc. 14-6 at 33:20–24). When she is experiencing depression, Plaintiff Johnson experiences an “[i]nability to do day-to-day tasks including sometimes just getting up.” (*Id.* at 34:2–5). Plaintiff Johnson distinguishes her anxiety and depression as “[a]nxiety feels like I am going to die and depression feels like I would like to die.” (*Id.* at 34:6–9). Plaintiff Johnson’s bouts of anxiety could last “[a]nywhere from an hour to longer; sometimes it [could] last the entire day.” (*Id.* at 34:14–17).

In the summer of 2020, Plaintiff Johnson began experiencing “levels of heightened stress[,]” which resulted in an increase in her anxiety. (*Id.* at 191:7–8). She experienced “difficulty breathing,” heart palpitations, and feelings of disorganization and discombobulation. (*Id.* at 191:8–11). According to Plaintiff Johnson, these symptoms impacted her ability to work, concentrate, and complete tasks, and that her symptoms worsened in the fall. (*Id.* at 191:12–24). By fall of 2020, Plaintiff Johnson began “experiencing additional depression.” (*Id.* at 191:21–192:2; *see* Doc. 16-1 at 5). As a result, “[t]here were mornings where [she] could not even, quite frankly, get out of bed to brush [her] own teeth.” (Doc. 14-6 at 192:2–4; *see* Doc. 16-1 at 5). Her anxiety “caused [her] to not be able to breath[,]” including during panic attacks, and she described “just difficulty just existing.” (Doc. 14-6 at 192:6–9). By the final three months of 2020, Plaintiff Johnson described her depression as “a near daily event.” (Doc. 16-3 ¶ 7). In her Affidavit, Plaintiff Johonson also described that between November 2020 and April 2021, “at least three out of five days in the work week, [she] was struggling with heightened depression or anxiety” and was experiencing “almost daily panic attacks” in early 2021. (*Id.* ¶ 10; Doc. 16-1 at 5–

15

6). Notes from a July 29, 2020 doctor's appointment describe "worsening anxiety since returning to work" and an incident in late July during which Plaintiff Johnson "felt very anxious and called in to work, she tried to go in but was not able to calm herself down." (Doc. 14-14 at 40, 42). During a February 17, 2021, doctor's visit, Plaintiff Johnson reported "increased anxiety" and explained that "she has felt her anxiety become worse over the past several weeks . . . [and] is feeling more stressed out due to being the only one at work in HR." (*Id.* at 29, 31). On March 4, 2021, Plaintiff Johnson reported that "her anxiety [was] better but she [was] still having some episodes" and that although her prescribed medication was helpful, she "[felt] like she need[ed] more help." (*Id.* at 25, 27). During an October 27, 2021, appointment, Plaintiff Johnson "discuss[ed] going on leave from work due to progressing anxiety causing panic attacks." (*Id.* at 13, 15). The doctor noted that Plaintiff Johnson was diagnosed "about 1 year ago" with anxiety and that she felt "her symptoms [were] worsening." (*Id.* at 15).

Plaintiff Johnson presented sufficient evidence in the form of her testimony, her affidavit, and the medical records, that a reasonable jury could find that her ability to concentrate and work was substantially limited compared to most people in the general population. While many people in the general population may experience one or more of Plaintiff Johnson's anxiety and depression symptoms, taken as a whole, there is no genuine issue of material fact as to whether Plaintiff Johnson's anxiety and depression caused major life activities to be substantially limited as compared to the general population. *See Forsyth v. Univ. of Ala. Bd. of Trs.*, 2018 WL 3012343, at *3 (N.D. Ala. June 15, 2018) (finding that plaintiff's "bare allegations of sleeplessness [were] insufficient to show that his difficulties sleeping were worse than difficulties suffered by most people in the general population," but that the plaintiff's allegation that his depression otherwise substantially limited his ability to interact with others was plausible). While Plaintiff Johnson's most intense symptoms may occur only when she has panic attacks, or during times of extreme stress at work, such a pattern constitutes the type of episodic impairment whose effect on major life activities the Court must analyze when the impairment is active. 29 C.F.R. § 1630.2(j)(1)(vii). Viewing the testimony regarding Plaintiff Johnson's depression and

16

anxiety disorder and her medical records in the light most favorable to Plaintiff Johnson, she has established that her depression and anxiety disorder were impairments that substantially limited major life activities, rendering her a person with an actual disability.

Even if Plaintiff Johnson's impairment could not be deemed an actual disability, Plaintiff Johnson also has demonstrated that Defendant regarded her as having an impairment. "[A] plaintiff need demonstrate only that the employer regarded h[er] as being impaired, not that the employer believed the impairment prevented the plaintiff from performing a major life activity." *Wolfe v. Postmaster Gen.*, 488 F. App'x 465, 468 (11th Cir. 2012); (*see* Doc. 16-1 at 7–9). In response to learning that Plaintiff Johnson had "some health conditions[,]" Plaintiff Updike "allowed [Plaintiff Johnson] . . . to be flexible in her scheduling to accommodate that." (Doc. 14-7 at 36:17–20). Moreover, Wilson recommended that Plaintiff Johnson consider taking FMLA leave. (Doc. 14-12 at 37:20–38:3). Wilson later described Plaintiff Johnson's anxiety and depression in a conversation with Welch. (Doc. 14-10 at 161:3–7). Thus, the evidence demonstrates that Defendant regarded Plaintiff Johnson as impaired.

### 2. Qualified Individual

"In order to make out the second prong of [her] prima facie case, [Plaintiff Johnson] must prove that [s]he is a 'qualified individual'—that is, someone with a disability who, 'with or without reasonable accommodation, can perform the essential functions of the employment position that such an individual holds[.]'" *Holly*, 492 F. 3d at 1256 (citing 42 U.S.C. § 12111(8)). Considering the evidence in the light most favorable to Plaintiff Johnson, there is sufficient evidence in the record to support a finding that Plaintiff Johnson could perform the essential functions of her position. At one point, Wilson stated that "[Plaintiff Johnson's] work is great[.]" (Doc. 14-12 at 81:3–4). At another point, Wilson emailed Haynes that she told Plaintiff Johnson she "valued her." (Doc. 14-17 at 2). Moreover, the fact that there needed to be a hand-off meeting to discuss the transition of Plaintiff Johnson's responsibilities during Plaintiff Johnson's leave supports the fact that Plaintiff Johnson was able to perform the essential functions of her position. (Doc. 14-17

at 2–3; Doc. 16-5; Doc. 14-6 at 108:20–109:12). Thus, the evidence demonstrates that Plaintiff Johnson is a qualified individual.

### 3. Discrimination Because of Disability

The third element of the *prima facie* case for an ADA discrimination claim imposes a "but-for" causation standard—that an adverse employment action would not have occurred but for the plaintiff's disability. *Akridge*, 93 F. 4th at 1192. Establishing discrimination "on the basis of disability" requires Plaintiff to show that her termination would not have occurred but for her disability. *See id.* at 1192–94 (explaining that the amended "on the basis of disability" language, which replaced "because of," language in the ADA did not change the requirement to show but-for causation). A plaintiff cannot simply show that her disability was a "motivating factor" for the adverse action. *Id.* at 1194 (quoting *Sailboat Bend Sober Living, LLC v. City of Fort Lauderdale*, 46 F.4th 1268, 1275 (11th Cir. 2022)) (other citations omitted). Rather, Plaintiff Johnson must demonstrate that the termination was caused by her disability. *See Holly*, 492 F.3d at 1263 n. 17.

Defendant makes no clear arguments as to whether it believes Plaintiff Johnson has established causation as to her ADA discrimination claim. Rather, Defendant argues that there is no causal link in Plaintiff Johnson's ADA retaliation claim. (Doc. 15-1 at 13). Plaintiff Johnson argues that she was subject to disability discrimination and that "there is evidence from which a jury could find that her mental health condition was a determinative, but-for factor in her termination." (Doc. 16-1 at 2–3). Plaintiff Johnson further argues that a jury could conclude that "[Defendant] would not have fired her absent the negative views by Welch" and others. (*Id.* at 15). The record shows that Plaintiff Johnson admits to time-keeping violations and theft of time, both of which are terminable offenses under Defendant's policy. Plaintiff Johnson has not presented evidence sufficient to show that discrimination was also a but-for cause of her termination whether considered in isolation or alongside her misconduct. Thus, while "single events often have multiple but-for causes," Plaintiff Johnson has failed sufficiently to establish that discrimination was a but-for cause of her termination. *Lapham v. Walgreen Co.*, 88 F.4th 879, 894 (11th Cir. 2023).

Accordingly, Plaintiff Johnson has failed to set forth a prima facie case of discrimination under the ADA.

### B. Legitimate Non-Discriminatory Reason

Even if Plaintiff Johnson had established a prima facie case of discrimination, Defendant has met its burden "to articulate a nondiscriminatory reason for the adverse action." *Batson*, 897 F.3d at 1329. This "exceedingly light" burden is one "of production, not persuasion." *Perryman v. Johnson Prods. Co.*, 698 F.2d 1138, 1142 (11th Cir. 1983); *Standard v. A.B.E.L. Servs., Inc.*, 161 F.3d 1318, 1331 (11th Cir. 1998). The Court "need not be persuaded that the defendant was actually motivated by the reasons offered." *Furcron v. Mail Centers Plus, LLC*, 843 F.3d 1295, 1312 (11th Cir. 2016). "Whether the 'defendant has met its burden of productions . . . involve[s] no credibility assessment.' It is sufficient for the defendant to produce admissible evidence that raises a genuine issue of fact as to whether discrimination has occurred." *Id.* at 1312–13 (quoting *St. Mary's Honor Ctr. V. Hicks*, 509 U.S. 502 (1993)).

Defendant argues that Plaintiff Johnson was terminated "for committing 151 violations of [Defendant's] time-keeping policies in the 205 workdays between January 2021 and [October 25, 2021, when] Plaintiff Johnson went out on FMLA leave." (Doc. 15 at 1). The violations were discovered during an investigation prompted by allegations submitted to Defendant's Compliance and Ethics Department by Director of Human Resources, Haynes, on November 4, 2021. (Doc. 14-11 at 143:2–24; Doc. 14-2 ¶ 42, *see* Doc. 14-22). The resulting investigation by the Compliance and Ethics Department revealed improper timekeeping and related policy violations and concluded that Plaintiff Johnson had taken three to four weeks off but had been paid without using paid time off and that she failed to badge in on 151 separate occasions between January 1, 2021 and October 25, 2021, in violation of Defendant's policies. (Doc. 14-2 ¶ 22). Considering the severity of the conduct, these were terminable offenses. "[A]n employer may fire an employee for a good reason, a bad reason, a reason based on erroneous facts, or for no reason at all, as long as its action is not for a discriminatory reason." *Owens v. Governor's Off. of Student Achievement*, 52 F.4th 1327, 1338 (11th Cir. 2022) (internal quotation

19

marks and citation omitted). If the evidence shows that the employer was dissatisfied with the plaintiff for non-discriminatory reasons, even if mistakenly or unfairly so, the employer is entitled to summary judgment. *Id.* (citation omitted). In reviewing an employer's proffered reasons for an adverse employment decision, the Court "do[es] not sit as a super-personnel department that reexamines an entity's business decisions" and "may not analyze whether an employer's proffered reasons are prudent or fair." *Akridge*, 93 F.4th at 1195. Accordingly, Defendant has set forth a legitimate non-discriminatory reason for Plaintiff Johnson's termination.

### C. Pretext

As Defendant has set forth a legitimate non-discriminatory reason for terminating Plaintiff Johnson, Plaintiff Johnson would have the burden of demonstrating that the Defendant's "proffered reason was pretextual by presenting evidence sufficient to permit a reasonable factfinder to conclude that the reasons given by the [Defendant] were not the real reasons for the adverse employment decision.'" *Batson*, 897 F.3d at 1329 (quoting *Martin v. Brevard Cnty. Pub. Sch.*, 543 F.3d 1261, 1268 (11th Cir. 2008)). To show pretext, a plaintiff must demonstrate "both that the reason was false, and that discrimination was the real reason." *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 515 (1993). The evidence must reveal "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could find them unworthy of credence." *Owens*, 52 F.4th at 1338. Plaintiff Johnson claims that Defendant's stated reason for firing her is pretext and that its reliance on the compliance inquiry was unfounded due to "several glaring holes in [its] findings." (Doc. 16-1 at 10).

First, Plaintiff Johnson argues that "the compliance inquiry found that on five unspecified days, [Plaintiff] Johnson reported working regular hours when she in fact took PTO, or personal time off." (*Id.*). Plaintiff Johnson argues that this conclusion is flawed because Jonathan McGuire, "the primary investigator," testified "that the forensic analyses of whether [Plaintiff] Johnson engaged in email on her company account or other work related digital activity on the September [7–10, 2021] days on which she purportedly failed

to work were inconclusive and not a reliable metric." (*Id.*; *see* Doc. 16-6 at 52:1–53:4). Plaintiff Johnson also suggests that Wilson reported these September time entries as a result of Plaintiff Johnson filing "a complaint about her for interfering with her right to take medical leave." (Doc. 16-1 at 10–11). Plaintiff Johnson argues that Wilson's allegations that Plaintiff Johnson failed to work on days she claimed to have work are discredited by "ample evidence[,]" including her failure to clarify whether her list of days that Plaintiff Johnson was unresponsive for long periods during the day established "that she failed to work some, or all, of the rest of the day." (*Id.* at 11). Plaintiff Johnson describes Wilson's interview with the Compliance and Ethics department as "vague at best" and that the report relies on Wilson's statements when making the finding regarding the 5 days. (*Id.*). Plaintiff Johnson contends that Wilson's email to Haynes contradicts two days that Defendant claims Plaintiff Johnson was paid without working. (*Id.* at 12; *see* Doc. 14-17 at 4). Specifically, Plaintiff Johnson argues that with regard to September 7, 2021, Wilson notes that Plaintiff Johnson "'left work early', not that she failed to work at all"; and that with regard to September 8, 2021, Wilson noted that Plaintiff Johnson "'was late for a meeting', not that she missed the meeting all together." (*Id.* at 12; *see* Doc. 14-17 at 4). As such, Plaintiff Johnson argues that "the record calls into question whether [Defendant] conducted fact-finding sufficient to justify a reasonable good faith belief that [Plaintiff] Johnson stole time from the company." (Doc. 16-1 at 12). Plaintiff Johnson further contends that "even if [Defendant's] claims were credited, the company's firing of [Plaintiff] Johnson over as many as six alleged time reporting errors was inconsistent with [Defendant's] progressive discipline policies for attendance issues." (*Id.*).

Next, while Plaintiff Johnson "does not dispute that she regularly entered time late, as many as 151 times in 2021[] or that she was by a significant margin the employee with the most cases of untimely reporting[,]" she argues (1) that "the fact a time entry was late, but made before the end of the pay period, would not have cost the company money or caused [her] to be fraudulently paid" and (2) that "[t]here is no evidence that the company's payroll department ever flagged the timeliness of [her] time entries." (*Id.* at 13). As such, Plaintiff Johnson argues that the "evidence on the other side of the scale that [her] persistent

struggles with depression and anxiety were motivating, casual factors in the decision to fire her" should be weighed against Defendant's "arguments for termination on the grounds that the two time related issues were reinforcing, that while either one might not have warranted termination, the combination was too much to overlook" and that such time infractions "were magnified by various productivity issues." (*Id.*). Finally, Plaintiff Johnson argues that Welch's testimony that "six unexcused absences" trigger a verbal warning and "eight unexcused absences" trigger a written warning is evidence of a deviation from Defendant's standard procedures as Defendant "skipp[ed] the first tiers of discipline" by firing Plaintiff Johnson who "had no prior disciplinary record in three years at the company." (Doc. 16-1 at 12–13; *see* Doc. 14-10 at 119:8–16).

That Plaintiff Johnson does not agree with how the investigation was conducted or with some of the results does not support a finding of pretext. First, Plaintiff Johnson admitted that she falsified her time more than 150 times and that she committed theft of time by taking paid leave without using her accrued leave. Even if some of the conclusions of the investigation were unsupported, critical conclusions were. Moreover, that Defendant may not have lost any money because of Plaintiff Johnson's violations does not bring Defendant's proffered reason into question. There is nothing to say that an employee had to have cost a company money in order to be fired. As noted above, "an employer may fire an employee for a good reason, a bad reason, a reason based on erroneous facts, or for no reason at all, as long as its action is not for a discriminatory reason." *Owens*, 52 F.4th at 1338. Also unpersuasive is Plaintiff Johnson's argument that the payroll department did not flag Plaintiff Johnson's timekeeping violations. It does not matter who made the violations known, there is no question that Plaintiff Johnson committed them. Finally, while "an employer's deviation from its own standard procedures may serve as evidence of pretext[,]" Plaintiff Johnson has not established that Defendant deviated from its standard disciplinary procedures. *Hurlbert v. St. Mary's Health Care Sys., Inc.*, 439 F.3d 1286, 1299 (11th Cir. 2006); *Key v. Central Georgia Kidney Specialists PC*, No. 20-14351, 2021 WL 5321892, at *5 (11th Cir. Nov. 16, 2021) (first citing *Hurlbert*, 439 F.3d at 1298–99; and then citing *Jones v. Gulf Coast Health Care of Del., LLC*, 854 F.3d 1261, 1275–76

22

(11th Cir. 2017)). While Welch's testimony described the typical disciplinary proceedings, he also stated that "[t]he levels may or may not be used" based on the severity of the infraction and that Defendant has the discretion to determine the severity of an infraction. (Doc. 14-10 at 119:8–23). Moreover, although Welch confirmed that "the normal discipline for . . . falsifying a time card is Level 2[,]" not termination, he explained that the number of times Plaintiff Johnson falsified her time card was "significant" and recalled that "more than 50 percent of the time [Plaintiff Johnson] did not work and claimed she did." (*Id.* at 120:20–25, 121:8–13). Given Plaintiff Johnson's admitted 151 time card violations, this was not a normal situation, and Defendant's deviation from its practice in the normal circumstance is not sufficient to prove pretext. Considered separately or taken together, Plaintiff Johnson has not offered evidence that Defendant's proffered legitimate non-discriminatory reason for her termination is pretext for discrimination.

### D. Convincing Mosaic Analysis

Plaintiff Johnson has failed to set forth a prima facie case of discrimination or show that Defendant's proffered legitimate non-discriminatory basis for her termination was pretext. A "plaintiff[, however,] will always survive summary judgment if she presents . . . . a convincing mosaic of circumstantial evidence that would allow a jury to infer intentional discrimination." *Akridge*, 93 F.4th at 1197 (quoting *Lewis v. City of Union City*, 934 F.3d 1169, 1185 (11th Cir. 2019)). "[T]he inference to be drawn by a jury must be that the employee's disability was a but-for cause of the employer's intentional discrimination." *Id.* (citing *Comcast Corp. v. Nat'l Ass'n of Afr. Am.-Owned Media*, 589 U.S. 327, 332–33 (2020)) (other citation omitted). "A plaintiff's mosaic may be made up of, among other things, (1) suspicious timing, ambiguous statements . . . , and other bits and pieces from which an inference of discriminatory intent might be drawn; (2) systemically better treatment of similarly situated employees; and (3) evidence that the employer's justification is pretextual." *Id.* at 1198 (internal quotation marks omitted) (quoting *Lewis*, 93 F.3d at 1185).

Plaintiff Johnson first points to the timing of her termination in relation to her October 2021 FMLA leave. Plaintiff Johnson points to the fact that, while she had 151

23

violations of the timekeeping policy between January 1, 2021 and October 25, 2021, she was not investigated until after her return from leave. Taken in context, this might appear suspicious; however, when one considers that Plaintiff Updike—who was Plaintiff Johnson's direct supervisor until August of 2021 and continued to manage her timekeeping until November of 2021—was complicit in Plaintiff Johnson's failure properly to keep her time and the theft of time, the fact that there was no investigation until after a new person began supervising Plaintiff Johnson is not suspicious. Moreover, that the compliance investigation was initiated after an anonymous complaint that Plaintiff Updike allowed Plaintiff Johnson to take three to four weeks of paid leave without requiring her to use paid time off militates against the idea that the timing was suspicious. Next, Plaintiff Johnson notes that another person in her position, who took three days off without taking appropriate leave, was not punished. While, "in a convincing-mosaic case, we may consider relevant evidence about similarly situated employees, even if those employees are not 'strict comparator[s]' at the prima facie stage," given that Plaintiff Johnson had over 150 time keeping violations and was paid improperly for between three to four weeks of work, the different treatment—taken separately or in conjunction with the timing of investigation—does not create a convincing mosaic sufficient for a jury to infer that discrimination was the but-for cause of Plaintiff Johnson's termination. *See Akridge*, 93 F.4th at 1198.

## II.    FMLA Interference Claim

The FMLA interference provision "makes it 'unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided under [the Act.]'" *Moore v. City of Homewood*, No. 21-11378, 2023 WL 129423, at \*10 (11th Cir. Jan. 9, 2023) (quoting 29 U.S.C. § 2516(a)(1)). The benefits provided by FMLA include "(1) '12 workweeks of leave during any 12-month period' for certain family and medical events, . . . and (2) the right 'to be restored by the employer to the position of employment held by the employee when the leave commenced.'" *Id.* (first quoting 29 U.S.C. § 2612(a)(1); and then quoting 29 U.S.C. § 2614(a)(1)). "To establish that an employer interfered with her [FMLA] rights, an employee need only show by a

preponderance of the evidence that she was entitled to the benefit that her employer denied." *Id.* (quoting *Matamoros v. Broward Sheriff's Off.*, 2 F.4th 1329, 1338 (11th Cir. 2021)). Moreover, to prevail on a FMLA interference claim, "a plaintiff must show harm from the alleged interference with her rights." *Id.* (quoting *Munoz v. Selig Enters., Inc.*, 981 F.3d 1265, 1274–75 (11th Cir. 2020)). The Supreme Court previously has explained, FMLA "provides no relief unless the employee has been *prejudiced* by the violation." *Ragsdale v. Wolverine World Wide, Inc.*, 535 U.S. 81, 89 (2002). "To show prejudice, the plaintiff must 'demonstrate some harm remediable by either 'damages' or 'equitable relief.'" *Moore*, 2023 WL 129423, at *10 (quoting *Evans v. Books-A-Million*, 762 F.3d 1288, 1296 (11th Cir. 2014)).

Plaintiff Johnson does not address Defendant's arguments as to the FMLA Interference Claim in her response. (*See* Doc. 16-1); *Jones v. Bank of Am., N.A.*, 564 F. App'x 432, 434 (11th Cir. 2014) (per curiam) ("[W]hen a party fails to respond to an argument or otherwise address a claim, the Court deems such argument or claim abandoned." (citation omitted)). As Plaintiff Johnson has made no argument regarding prejudice or demonstrable harm from the purported interference, she had abandoned this claim. (*See* Doc. 16-1). Moreover, the evidence demonstrates that Wilson suggested that Plaintiff Johnson consider taking leave under FMLA, and Plaintiff Johnson did in fact take FMLA leave. (Doc. 14-17 at 2; Doc. 14-12 at 37:20–38:3, *see* Doc. 16-3 ¶ 19). When Plaintiff Johnson returned from leave, she was reinstated to her position and given clear guidelines and expectations for moving forward. (*See* Doc. 14-21 at 3). That Plaintiff Johnson subsequently was fired for her admitted time-keeping violations and theft of time, does not constitute FMLA interference. Therefore, even if Plaintiff Johnson had not abandoned her FMLA interference claim, she has failed to demonstrate a genuine issue of material fact as to the claim. Accordingly, Defendant is entitled to summary judgment on the FMLA interference claim.

### III.    Retaliation in Violation of the ADA and FMLA

Finally, Plaintiff Johnson asserts claims for retaliation in violation of the ADA and in violation of the FMLA. (Doc. 1 ¶¶ 53–57, 69–75). As a threshold matter, "[b]ecause the

FMLA and ADA retaliation claims require similar legal analysis and depend upon the same set of facts," the Court addresses Plaintiff Johnson's retaliation claims together. *Batson*, 897 F.3d at 1327. The ADA "includes 'an express antiretaliation provision[,]' . . . [which] prohibits 'discriminat[ing] against any individual because such individual has opposed any act or practice made unlawful [by the Act] or . . . made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this chapter.'" *Batson*, 897 F.3d at 1328 (first quoting *Univ. of Tex. Sw. Med. Ctr. V. Nassar*, 570 U.S. 338, 357 (2013); and then quoting 42 U.S.C. § 12203(a)) (second omission in original)). Likewise, the FMLA "prohibits employers from retaliating against employees for engaging in protected activities." *Munoz*, 981 F.3d at 1275 (citing *Batson*, 897 F.3d at 1328); *see also Strickland v. Water Works & Sewer Bd. Of City of Birmingham*, 239 F.3d 1199, 1206 (11th Cir. 2001).

A court evaluates retaliatory-discharge claims under the ADA and FMLA employing the burden-shifting framework used to assess retaliation claims in Title VII cases. *Todd. v. Fayette Cnty. Sch. Dist.*, 988 F.3d 1203, 1219 (11th Cir. 2021). In order to establish a *prima facie* case of retaliation under either the ADA or the FMLA, "a plaintiff must show that: (1) she engaged in a statutorily protected expression; (2) she suffered an adverse employment action; and (3) there was a causal link between the adverse action and her protected expression." *Id.* (citations omitted). "The third element requires a showing of but-for causation." *Frazier-White v. Gee*, 818 F.3d 1249, 1258 (11th Cir. 2016) (citing *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338 (2013); *Lapham*, 88 F.4th at 893–94 (holding, "the proper causation standard for FMLA . . . retaliation claims is but-for causation." (citation omitted)). Once a plaintiff satisfies this burden, "the burden shifts to the employer to articulate a nondiscriminatory reason for the adverse action. If the employer does so, the burden shifts back to the employee to produce evidence that the employer's reason is pretextual." *Munoz*, 981 F.3d at 1275 (citing *Batson*, 897 F.3d at 1328–29).

### A. Prima Facie Case

As discussed below, Plaintiff Johnson has failed to set forth a prima facie case of retaliation under the ADA and FMLA.

### 1. Protected Activity

In the Complaint, Plaintiff Johnson alleges that she engaged in a protected activity "in the form of an internal complaint of disability-based discrimination by a corporate official employed by Defendant." (Doc. 1 ¶ 54). Defendant argues that this cannot be a protected activity under the ADA because Plaintiff Johnson's complaint to Haynes was "about FMLA leave, not disability-based discrimination." (Doc. 15-1 at 13). Plaintiff Johnson addresses her ADA and FMLA retaliation claims together, stating that "[f]actually, the two retaliation claims are intertwined, . . . and contain[] elements of both ADA and FMLA retaliation." (Doc. 16-1 at 18). An employee engages in protected expression when she opposes a practice the statute makes unlawful or when she makes a request for a reasonable accommodation. *See Frazier-White v. Gee*, 818 F.3d 1249, 1258 (11th Cir. 2016) (citation omitted) (ADA); *see also Pereda v. Brookdale Senior Living Communities, LLC*, 666 F.3d 1269, 1276 (11th Cir. 2012) (FMLA). Both informal complaints and internal grievances can be statutorily protected expression. *See Rollins v. Fla. Dep't of L. Enf't*, 868 F.2d 397, 400 (11th Cir. 1989) (per curiam) (Title VII). "A complaint about an employment practice constitutes protected opposition only if the individual explicitly or implicitly communicates a belief that the [employment] practice constitutes unlawful employment discrimination." *Murphy v. City of Aventura*, 383 F. App'x 915, 918 (11th Cir. 2010) (per curiam) (internal quotation marks and citation omitted) (Title VII).

Plaintiff Johnson complained to Haynes about a comment Wilson made during a team meeting on October 22, 2021. (*See* Doc. 14-18). In Plaintiff Johnson's email to Haynes, she states: "I felt targeted [by] this comment because of previous conversations I've had with [Wilson] about my struggles with anxiety and situations at work. Also, this followed right after we talked about me needing to take [FMLA] leave." (Doc. 14-18). Plaintiff Johnson "explicitly communicate[d] a belief that [Wilson's comment during the

team handoff meeting] constitute[d] unlawful employment discrimination." *See Murphy*, 383 F. App'x 915, 918 (11th Cir. 2010) (per curiam). Thus, Plaintiff Johnson sufficiently alleges that she engaged in a protected activity under the ADA when she reported Wilson's comments. Moreover, that the comments were made during a hand-off meeting for Plaintiff Johnson's FMLA leave, when considered in the light most favorable to Plaintiff Johnson, is sufficient to establish that Plaintiff Johnson engaged in protected activity under the FMLA. (Doc. 1 ¶ 54; Doc. 16-1 at 18; Doc. 15-1 at 13).

### 2. Adverse Employment Action

There is no question that Plaintiff Johnson suffered an adverse employment action when she was fired. "An adverse employment action is an action that 'might have dissuaded a reasonable worker' from engaging in protected activity." *Chandler v. Sheriff, Walton Cnty.*, No. 22-13698, 2023 WL 7297918, at *2 (11th Cir. 2023) (per curiam) (quoting *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006)). Adverse employment actions include "conduct that alters the employee's compensation, terms, conditions, or privileges of employment, deprives him or her of employment opportunities, or adversely affects his or her status as an employee." *Id.* (quoting *Cotton v. Cracker Barrel Old Country Store, Inc.*, 434 F.3d 1227, 1233 (11th Cir. 2006) (internal quotation marks omitted)). Plaintiff Johnson was terminated on December 13, 2021. (Doc. 16-3 ¶ 23). Therefore, her termination, "alter[ing] [her] compensation, terms, conditions, or privileges of employment," squarely falls within the definition of an adverse employment action. *Chandler*, 2023 WL 7297918, at *2 (citation omitted).

### 3. Causal Link

Plaintiff Johnson engaged in a protected activity when she complained about the comment Wilson made during the handoff meeting. Moreover, as Plaintiff Johnson complained about Wilson's comments to Welch, "the decision maker was aware of the protected conduct at the time of the adverse employment action." *Brungart v. BellSouth Telecommunications, Inc.*, 231 F.3d 791, 799 (11th Cir. 2000). Plaintiff Johnson relies on temporal proximity to establish causation; but, given that the standard is but-for causation, temporal proximity is not necessarily sufficient. "[B]ut-for causation "is established

whenever a particular outcome would not have happened 'but for' the purported cause." *Bostock v. Clayton County*, 590 U.S. 644, 656 (2020). Thus, the but-for test "directs us to change one thing at a time and see if the outcome changes." *Id.* If it does, the isolated factor is a but-for cause. And if it does not, the isolated factor is not a but-for cause, and all the other factors, taken together, are sufficient. *See id.*; *see also Burrage*, 571 U.S. at 211 (describing a but-for cause as a "straw that broke the camel's back"). Here, there is no dispute that Plaintiff Johnson was fired after it was discovered that she had falsified her time reports and committed theft of time. Plaintiff Johnson has not established, however, that if she had not taken FMLA leave, she would not have been fired. Plaintiff Johnson has offered no evidence, other than timing—considered separately or along with her misconduct—that availing herself of FMLA leave was the singular cause or the straw that broke the camel's back. Accordingly, Plaintiff Johnson has failed to set forth a prima facie case of retaliation.

## B. Legitimate Non-Discriminatory Reason and Pretext

Even if Plaintiff Johnson had set forth a prima facie case of retaliation, as discussed above, Defendant has set forth a legitimate non-discriminatory reason for terminating Plaintiff Johnson's employment. Likewise, as discussed above, Plaintiff Johnson has not established that Defendant's legitimate non-discriminatory reason for her termination was pretext for discrimination.

## C. Convincing Mosaic Analysis

Unlike with the charge of discrimination, there is a convincing mosaic of circumstantial evidence from which a reasonable jury could infer retaliation. That the investigation that culminated in Plaintiff Johnson's termination commenced immediately after Plaintiff Johnson complained about Wilson's comments and was based, in part, on a timeline submitted by Wilson "coalesces into a mosaic of circumstantial evidence sufficient to create a triable issue of material fact on whether [Defendant's] actions were [retaliatory.]" *Lewis*, 934 F.3d at 1189; *see Ismael v. Roundtree*, 161 F.4th 752, 761–63 (11th Cir. 2025). As there is sufficient evidence for Plaintiff Johnson's retaliation claims to be submitted to a jury, summary judgment is not appropriate.

29

## CONCLUSION

For the reasons stated above, Defendant's Motion for Summary Judgment as to Plaintiff Johnson (Doc. 15) is **GRANTED in part and DENIED in part**. Plaintiff Johnson's ADA Discrimination Claim and FMLA Interference Claim are **DISMISSED** and her ADA and FMLA Retaliation Claims remain pending.

**SO ORDERED**, this 31st day of March, 2026.

/s/ Leslie A. Gardner
**LESLIE A. GARDNER, CHIEF JUDGE**
**UNITED STATES DISTRICT COURT**